## N. L. MILLER v. STATE.

No. A-1618. Opinion Filed April 26, 1913.

(131 Pac. 717.)

1. WITNESSES—Expert Evidence—Admissibility—"Experts"—"Art or Trade"—Questions of Law and Fact. (a) As a general rule, expert or opinion evidence is not admissible as to matters which are within the common knowledge and understanding of mankind generally, and which the jury are as competent to understand and determine as the witnesses could be.

(b) Experts are persons who are professionally acquainted with some science or are skilled in some art or trade, or who have experience or knowledge in relation to matters which are not generally known to the people.

(c) Every business or employment which requires peculiar knowledge or experience and which has a class of persons devoted to its pursuit is included in the term "art or trade," and any person, who by study or experience, has acquired this peculiar knowledge or practical skill may be allowed to give in evidence his opinions upon matters of technical knowledge and skill.

(d) In prosecutions for murder, medical experts may be allowed to testify to their opinion as to the cause and manner of the death of the deceased.

(e) The admissibility of the testimony of expert witnesses is a question of law for the determination of the court. The weight and credibility to be given to such opinions is a question for the jury alone to determine.

(f) As a general rule expert evidence is not admissible for the purpose of proving that a wound was or was not self-inflicted; but, where a wound is of an extraordinary nature and is upon a portion of the body of which men have little or no knowledge, then expert evidence is admissible for the purpose of showing that such wound was or was not self-inflicted.

2. HOMICIDE — Evidence — Admissibility — Motive — Other Offenses. (a) Where a defendant is upon trial charged with the murder of a girl, for the purpose of proving motive it is competent for the state to show all of the relations existing between the deceased and the defendant, and that the defendant had entertained illicit sexual relations with the deceased by which the deceased had become pregnant, and that the defendant attempted to have an abortion performed upon the deceased, and that the defendant, being a married man, had become estranged from his wife.

(b) Any evidence is admissible upon a trial in a criminal case which tends to prove the defendant guilty of the crime with which he is charged, although it may also prove, or tend to prove, another separate and distinct crime.

3. TRIAL—Instructions—Weight of Evidence—Testimony of Experts. (a) Where expert evidence is introduced in the trial of a cause, it is improper for the court to give argumentative instructions thereon or to attempt to instruct the jury as to what weight and credibility should be given to the testimony of experts.

(b) For an approved instruction with reference to the testimony of experts, see opinion.

4. HOMICIDE—Evidence—Sufficiency. See opinion for evidence held to establish the guilt of a defendant of murder upon circumstantial evidence.

5. APPEAL—Presentation for Review—Remarks of Counsel—Grounds for Reversal. (a) Improper remarks made by a prosecuting attorney in his argument to the jury must be incorporated in the case-made and certified to by the trial judge before they can be considered upon appeal. Such remarks cannot be presented by affidavit or in any other manner, unless it appears from the record that counsel for the defendant requested the trial judge to have such remarks taken down by the stenographer in order that they might be incorporated in the record and that the court refused to have this done.

(b) When counsel for a defendant request the trial court to have a stenographer take down in shorthand any statement made by a prosecuting attorney during his argument, to be made a part of the record upon appeal, and the court refuses to comply with such request, then the fact of such request and refusal may be shown by affidavits or any other competent evidence, and such refusal upon the part of the court constitutes ground for reversal without regard to the merits of the case.

6. HOMICIDE—Punishment—Seduction. The protection of female purity requires that men who seduce young and inexperienced girls and then murder them to cover up their own infamy should receive the most severe possible punishment.

(Syllabus by the Court.)

*Appeal from District Court, Woodward County;*
*James B. Cullison, Judge.*

N. L. Miller was convicted of murder, and he appeals. Affirmed.

*L. T. Wilson* and *Charles Swindall,* for appellant.

*Smith C. Matson* and *Joseph L. Hull,* Asst. Attys. Gen., and *Moman Pruiett,* for the State.

FURMAN, J. For the purpose of logical arrangement, we will consider the questions presented in the order in which they arose at the trial rather than in the order in which they are presented in the brief of counsel for appellant.

First. Dr. M. Bilby, having first qualified as an expert, testified that on the 9th day of November, 1910, he was called to the old opera house in Alva to examine the body of the deceased; her face was very dark, in fact, almost black; her eyes were slightly protruding; her lips were partly opened; the white part of her eyes was bloodshot; both of the eyes were very red and the lids of the eyes were protruding; her tongue was slightly protruding between her teeth; her body was lying in a lay-out position; her feet were both together and her hands were folded across her breast; there was a scarf very tightly drawn around her neck running back and resting under her head; there had been an evacuation of her kidneys and bladder and apparently

the body had been pulled down four or five inches after the evacuation was over; her clothes were wet, and the carpet on which she was lying was wet up to the small of her back; there had also been a slight evacuation of the bowels. The following question was then asked this witness: "Now, Doctor, from the condition of that body and its condition in all respects, what, in your opinion and judgment, would you say caused the death of that girl?" To which counsel for appellant objected upon the ground that such evidence was irrelevant, incompetent, and immaterial and would invade the province of the jury, which objection was by the court overruled, to which counsel for appellant excepted. The witness then replied: "I would say that, from the condition and facts, she was strangled; that she met her death by strangulation." The witness was then asked the further question: "If the condition of this scarf that was wound around her neck was as tight as it was when you found her, would that produce death? Answer: Yes, sir." To which counsel for appellant objected upon the ground that the question was argumentative and had already been asked and answered. The following question was then asked the witness: "I will ask you this question, Doctor: In your judgment, if it had been possible for Mable Oakes to strangle herself and produce strangulation to the extent to produce her death and then placed her hands upon her breast?" To which counsel for appellant objected upon the ground that it was incompetent, irrelevant, and immaterial and invaded the province of the jury and required the witness to pass upon the weight and sufficiency of the evidence, which objection was by the court overruled, to which question the witness replied: "It would have been impossible for her to have strangled herself and placed her hands on her breast, and also the ends of the scarf back under her head; that would have been impossible."

Dr. O. E. Temple was then placed upon the stand by the state and qualified as an expert. He testified that he too was called to examine the body of the deceased. His testimony in the main fully corroborates the testimony of Dr. Bilby. He

mentioned, however, some additional facts. He stated that the clothing of the deceased was smooth and straightened out nicely, and that between her hands was the wrapper off of a piece of Yucatan chewing gum. He describes the scarf around the neck of the deceased as follows:

"There was a silk scarf around her neck the same as if you would take the scarf in your hands in this way and put the middle of the scarf here and laid it back and cross it behind and bring the ends around and cross it in front. The ends were then drawn tightly and tucked under the back of the neck. It was drawn very tightly and was imbedded in the skin and flesh of the neck so that when it was removed it left the print of the scarf on her neck."

*Rigor mortis* had not set in when the witness examined the body of the deceased. The body was not yet stiff. The following question was then asked the witness:

"Taking your experience as a physician, your knowledge of strangulation and knowledge of the condition of that body, the ecchymotic condition, in fact, the entire condition of the body, taking everything into consideration, are you able to state what produced the death of the deceased?"

To this question counsel for appellant objected upon the ground that it was incompetent, irrelevant, and immaterial and related to a subject which did not call for expert testimony and that it invaded the province of the jury. This objection was by the court overruled, to which ruling of the court counsel for appellant excepted. The witness was then asked: "Are you in a position to state what caused death?" Answer: "Yes, sir." The witness was then asked: "Taking your experience as a physician and your knowledge of strangulation and the condition of the body here and the condition of the hands, the attitude of the body and all, are you able to state whether or not Mable Oakes could have strangled herself to death?" To this question counsel for appellant objected upon the ground that it was irrelevant and incompetent and not upon a subject requiring expert testimony and invaded the province of the jury. Which objection was by the court overruled, to which counsel

. for appellant excepted. The witness replied, "No, she could not."

Dr. E. Granthum was placed upon the stand by the state and qualified as an expert. The testimony of this witness fully corroborated all of the statements made by the preceding witnesses with a few additions. The clothing of the deceased was drawn up behind as though the body had been pulled down and the clothes dragged up when it was pulled down. This witness also testified to a post mortem examination of deceased and that the heart of the deceased was perfectly normal; the lungs were not in a normal condition but were very dark; and that the deceased was pregnant, the foetus being probably about four and one-half months old. The following question was then asked the witness:

"Now, Doctor, taking your experience as a physician and knowledge of works on strangulation, your knowledge of the condition of the body when you found it, and its location at the time, location of the scarf and condition and location of the hands and of all and of every condition and all that surrounded the body, can you say or are you able to say what produced her death?"

To which counsel for appellant objected upon the ground that it was incompetent, irrelevant, and immaterial and called for a conclusion of the witness and invaded the province of the jury, which objection was by the court overruled, to which counsel for appellant excepted. The witness replied: "Yes, sir; I am able to state. Q. What, then, in your judgment produced the death of the deceased?" The witness replied that her death was due to strangulation. The following question was then asked the witness: "From your experience as a physician and the condition you found there and the condition of the body, can you say whether or not Mable Oakes strangled herself to death?" To which counsel for appellant objected upon the ground that it was incompetent, irrelevant, and immaterial, called for a conclusion of the witness upon testimony upon which expert evidence was not required. Which objection was by the court overruled, to which ruling of the court

counsel for appellant excepted. The witness then testified: "I say she could not have strangled herself to death."

Dr. Edwin De Barr testified that he occupied the chair of chemistry in the State University; that he was a graduate of the Michigan State Agricultural College and also the Michigan State University, and had also studied at the Chicago University. He also testified that he had made a study of the subject of strangulation and had had experience in a number of cases in which death had resulted from strangulation. He further testified that he had received from Dr. Bilby a stomach purporting to be the stomach of the deceased for the purpose of making an analysis of its contents. He detected the odor of whisky in the stomach; he also found one-fourth of a grain of strychnine and three-fourths of a grain of morphine in the stomach; that the morphine and strychnine found in the stomach was not sufficient to produce death; he found the inner coating of the stomach congested with little spots where the blood had collected. He was then asked the following question:

"Taking the body of a girl 23 years of age, robust, having a sound heart, the right heart being filled with blood of a dark color, the girl being found lying in a room with her hands across her chest, her face very dark, her eyes slightly protruding, lips almost closed, the clear white part of the eyes bloodshot in both eyes, the lips protruding, tongue slightly protruding between the teeth, body found lying on her back straightened out with her feet together, with a scarf drawn twice around her neck very tight and the ends turned back and resting 'under the head, the scarf being pressed deep into the skin, the skin bulging out over the scarf, face contorted, discoloration both above and below the scarf, there had been an evacuation of the kidneys and a slight evacuation of the bowels, lungs congested, the stomach containing an ecchymotic condition, a little bloody froth coming out of the mouth and nose, the hands folded upon the chest, from your experience as an expert and as a physician are you able to state what produced her death?"

To which counsel for appellant objected that this was not a proper hypothetical question as it contained statements which were not proven to exist and also being irrelevant, incompetent,

and immaterial, and because the witness had not proven himself to be a doctor or physician and as invading the province of the jury. Which objection was by the court overruled, to which counsel for appellant excepted. The witness replied, "I am not a practicing physician, but I am able to state that she died from strangulation." The witness was then asked, "Taking the condition of the body as described in the hypothetical question, are you able to say as to whether or not the deceased could have strangled herself to death?" To which counsel for appellant objected upon the ground that it was incompetent, irrelevant, and immaterial and invaded the province of the jury. This objection was by the court overruled, to which ruling counsel for appellant excepted. The witness then said, "I will say she came to her death by strangulation by a person other than herself." The objections to all of these questions and the answers thereto relate to the same subject and involve the same principles of law, and therefore will all be discussed together.

As we gather from the brief of counsel for appellant and the oral argument made when the case was submitted, the contention is that the expert testimony should not have gone further than to state that the death of the deceased might have been caused by strangulation and that the court erred in permitting the witnesses to state that in their opinion the deceased did die from strangulation which was not self-inflicted.

In their brief counsel for appellant state their position as follows:

"We have given the testimony of three physicians and a chemist, Edwin De Barr, the testimony upon which the state relies to prove the *corpus delicti*. It will be observed that, over the protests and objections of the defendant, these witnesses were permitted to testify that death was caused by strangulation, not that death might have been caused by strangulation. Instead of being tried by a jury of 12 men, the defendant was in fact tried and convicted by three doctors and a chemist."

We cannot agree with this contention. It clearly appears from the testimony of all of the witnesses that they were only expressing their opinions as experts as to the cause of the death

of the deceased. Counsel for appellant had the right, on cross-examination, to question these witnesses fully and·show, if they, could, any other facts and circumstances than those relied upon by the state which might have resulted in the death of the deceased and which would in any manner weaken the opinions expressed by the witnesses as to the cause of the death of the deceased.

As a rule, expert or opinion evidence is not admissible as to any matters which are within the knowledge or understanding ·of mankind generally and is confined to questions requiring special skill or scientific knowledge. See *Byers v. State,* 1 Okla. ·Cr. 677, 100 Pac. 261, 103 Pac. 532, and *Price v. United States,* 2 Okla. Cr. 449, 101 Pac. 1036, 139 Am. St. Rep. 930. It would be difficult, if not impossible, to lay down a general rule which is applicable to all cases as to what is, and what is not, expert evidence. Experts are persons who ·are professionally acquainted with some science, or are skilled in some art or trade, or who have experience and knowledge in relation to matters which are not generally known to the people. Every business or employment which requires peculiar knowledge or experience, and which has a class of persons devoted to its pursuit, is included in the terms art or trade, and any person who, by study or experience, has acquired this particular knowledge or practical skill may be allowed to give in evidence his opinions upon matters of technical knowledge and skill. The cases in which opinion evidence is admissible are of endless variety and may be divided into two classes: First. Where experts in a particular science or calling are permitted to state the opinions formed by them from hypothetical statements of facts propounded to them, or to state their opinions from facts within their personal knowledge. Second. Where persons not experts are permitted to testify as to opinions formed by them in regard to the common transactions of life at the time of their occurrence and concerning things which cannot be reproduced before the jury. See *Dillard v. State,* 58 Miss. 368. Under the first heard would come the familiar cases of opinions of men of

science, testifying as to the peculiar learning connected therewith, or of the practical man who details the result of long observation in the particular calling to which he has devoted himself. Under the second would fall those instances in which the common observer is permitted to testify as to the direction from which a particular sound seemed to come, or as to the apparent size or weight of a stationary object or the speed of a moving one, as to whether a person appeared to be sick or well or drunk or sober, or sane or insane,    as well as countless other instances, more easily imagined than enumerated.

In *Koccis v. State,* 56 N. J. Law, 44, 27 Atl. 800, Garrison, J., said:

"The expert witness is one whose possession of special knowledge renders his opinion admissible upon a state of facts within his specialty, without regard to the manner in which the facts are established, and without requiring that they should have come, in whole or in part, under the personal observation of the witness; whereas the sole ground upon which a witness may give an opinion as to matters of ordinary knowledge is that they not only came within his personal observation, but that they come into proof so blended with the opinion to which they give rise that it is receivable in proof as a substitute for a specification of the host of circumstances that called it forth."

See, further, *Yates Bros. v. Garrett,* 19 Okla. 449, 92 Pac. 142; *State v. Baldwin,* 36 Kan. 1, 12 Pac. 318; *Thompson v. Pennsylvania R. Co.,* 51 N. J. Law, 42, 15 Atl. 833; *Powers v. McKenzie,* 90 Tenn. 167, 16 S. W. 559; *McKelvey v. Chesapeake & Ohio R. Co.,* 35 W. Va. 500, 14 S. E. 261. In the last case it was said:

"The nonexpert testifies as to conclusions which may be verified by the court or jury; the expert to conclusions which cannot be. The nonexpert gives results of a process of reasoning familiar to everyday life; the expert gives the results of a process of reasoning which can be mastered only by special scientists."

Experts are persons selected by a court or parties to a cause, on account of their knowledge or skill, to examine, estimate, and ascertain things and make a report of their opinion. *Spiden v. State,* 3 Tex. App. 156, 30 Am. Rep. 126

(citing Bouv. Law. Dict.) ; *Heacock v. State,* 13 Tex. App. 97, 131; *Le Mere v. McHale,* 30 Minn. 410, 15 N. W. 682; *Travis v. Brown,* 43 Pa. (7 Wright) 9, 12, 82 Am. Dec. 540. Mr. Lawson lays down the rule that one may be qualified as an expert witness by studying without practice or practice without study. Lawson, Exp. Ev. p. 210. He justly adds that mere observation, without either study or practice, will not be sufficient. *Wheeler & Wilson Mfg. Co. v. Buckhout,* 60 N. J. Law, 102, 36 Atl. 772, 773.

Expert testimony is admitted because the witnesses are supposed, from their experience and study, to have peculiar knowledge upon the subject of inquiry which jurors generally have not, and are thus supposed to be more capable of drawing conclusions from facts and basing opinions upon them than jurors generally are presumed to be. In prosecutions for murder, the testimony of medical experts, as to the cause and manner of the death of the deceased, may be indispensable. The case at bar is an illustration of this. Very few persons have any knowledge or experience with reference to death caused by strangulation. Without the testimony of medical experts, the jury would have been entirely in the dark on this subject. The admissibility of this evidence was a question for the determination of the court. The weight and credibility of the opinions of experts was a question for the jury to determine, and, if such opinions were not well founded, this could have been shown upon cross-examination. The most serious objection to the introduction of the evidence complained of was as to whether or not deceased died from self-inflicted strangulation or whether she died from strangulation produced and caused by some other person. The general rule is that expert evidence is not admissible for the purpose of proving that a wound was or was not self-inflicted. See *Aetna Life Ins. Co. v. Kaizer,* 115 Ky. 539, 74 S. W. 203. But there are exceptions to this rule, as there are to all other rules. In cases where a wound is of an extraordinary nature and is upon a portion of the body of which men have little or no knowledge, then expert evidence is

admissible for the purpose of showing that it was or was not self-inflicted.

The case of *State v. Lee,* 65 'Conn. 265, 30 Atl. 1110, 27 L. R. A. 498, 48 Am. St. Rep. 202, presents an instructive discussion of this question. Lee was indicted for murder and was acquitted. The state appealed upon a question of law, complaining that the trial court had excluded expert testimony showing the wound from which deceased died was not self-inflicted. Discussing this question the court said:

"The fifth assignment of error is as follows: 'The court erred in excluding the following question asked by Mr. Doolittle of the same witness (Moses C. White): "You examined the uterus in this case, under the conditions you testified to. You made the post mortem and examined the uterus in this case, and have described its conditions. Now, I wish to ask you whether, from your examination of the body of the uterus, in your opinion, the wounds which you have described, upon the wall of the uterus, were self-inflicted."' The finding details in full the facts in the case claimed to have been·proved by the state and by the defense. The victim of the crime charged was a woman whose death was caused by a lacerated wound in the uterus, made by some instrument used in the production of an abortion shortly prior to her death. The defendant was a practicing physician, whom the deceased consulted for the first time after she decided on suffering an abortion. The testimony introduced in chief by the state was sufficient to justify the jury, if they believed the witnesses, in drawing an inference of the defendant's guilt. The testimony introduced by the defendant consisted mainly in contradictions of the state's witnesses; the most important contradiction being that of the accused himself, who denied having performed any operation upon the deceased, and stated that in attending the deceased during her last illness, caused by the abortion, and superintending her delivery of a dead foetus and afterbirth, he acted only as an honest medical practitioner would act when called to attend a woman suffering from such injuries. He said the injuries were inflicted by the deceased herself, and offered testimony claimed as tending to show that she was familiar with the mode of producing abortion by mechanical means, and also testimony that the deceased stated she had inflicted the injury upon herself, and had made this statement subsequent to her dying declaration testified to by

the state's witnesses, in which she charged the defendant with having produced the abortion. Upon rebuttal the state called the witness Moses C. White, a practicing physician and medical examiner for the county, who had, as such public officer, performed an autopsy on the body of the deceased. Dr. White had been previously examined by the state and cross-examined by the defense as a medical expert. It is patent that, under these circumstances, the opinion of Dr. White, as a medical and surgical expert, upon the question whether the wound he had examined and described to the jury was so situated and of such a nature as to render its self-infliction impracticable, was admissible evidence. It is true that a wound may be so situated that the practicability of self-infliction is an inference which all men are competent to draw, requiring no particular knowledge or experience, and therefore not a proper subject of expert testimony. But to draw such an inference from this particular wound on the interior surface of the womb of the deceased plainly required peculiar knowledge and experience, not common to the world; and therefore the opinion of an expert, founded on such knowledge and experience is admissible. *Taylor v. Monroe,* 43 Conn. 44; Whart. Crim. Ev. p. 403. The importance of the excluded testimony is not less clear. The testimony in the case, as appears from the record, was of such a nature that the question of the defendant's guilt might have wholly turned on the disputed fact of self-infliction of the wound. The defendant himself relied on the possibility of that fact existing as a principal hypothesis consistent with the evidence and his own innocence. The evidence excluded was relevant to that fact. Justice required the admission of the evidence. What weight might have been given to it cannot be known, but it well may be that the opinion of Dr. White would have convinced the jury that the wound was not self-inflicted, and that there remained no reasonable hypothesis consistent with the evidence and the innocence of the prisoner."

The case of *Beckett v. Northwestern Masonic Aid Association,* 67 Minn. 298, 69 N. W. 923, is also in point. In that case expert evidence was held to be competent showing that it is very rarely that a suicide inflicts a wound on himself on the back of his person. In *State v. Knight,* 43 Me. 11, it was held that it was proper to allow a medical expert to testify that

in his opinion the wound described in the neck of the deceased could not have been inflicted by his own hand.

We are therefore of the opinion that the evidence objected to was competent and proper, and that the court did not err in admitting the same.

Second. N. J. Lewellen testified for the state that, about six months before the death of the deceased, witness had a conversation with appellant with reference to the deceased in which appellant stated that there was not a better girl living than Mable Oakes; he thought her a perfect lady in every respect; he thought the world of her as a clerk and a woman. In a later conversation appellant said :"I am not getting along just right at home. If anything ever comes up that I can do it I am going to marry that lady." He said he wanted to get her to love him. In a subsequent conversation appellant stated to witness that he was loving deceased fit to kill and she was loving him. In a later conversation appellant told witness that he (appellant) and Mable Oakes had been out buggy riding and that he and Mable Oakes had had sexual intercourse and that Mable cried all of the next day. Appellant subsequently told witness that one night the folks of the deceased were away from home; that they were gone out in the country; and that he went to her home and stayed with her all night. Appellant told witness that it took him an hour and a half to accomplish his purpose the first time he had sexual intercourse with the deceased. Appellant also told witness that he could not live at home; it was too hot for him; that he did not have any pleasure at home; sometimes he went there for his meals and sometimes he did not; that he and his wife did not sleep together; she slept upstairs with the girls and he had a separate room to himself; that he was not living with his wife now and did not think he ever would; and that if his wife did not make up with him he had everything arranged to get a divorce. About four weeks before the death of Mable Oakes appellant told witness that he had made

up with his wife. Shortly before the death of the deceased, appellant told witness that the deceased had gone to Dr. Safford to be examined to find out whether or not she was pregnant. Appellant also told witness that the deceased had sinking spells or spells of the heart, and that he had to have a little whisky in the office for her when she had a bad spell. To all of this evidence appellant strongly objected upon the ground that it tended to prove a separate, independent, and distinct offense from that of which appellant was upon trial, and thereby prejudiced his case in the minds of the jurors. The court overruled this objection, to which appellant excepted.

Dr. W. B. Safford testified for the state that, about three weeks before the death of Mable Oakes, appellant requested witness to examine her to ascertain whether or not she was pregnant, and that witness made an appointment with appellant for the deceased to visit his office for this purpose; that soon after this deceased came to the office of witness and submitted to a physical examination when witness discovered that she was pregnant; that, within an hour after the examination was made, appellant came to the office of witness to ascertain the result of the examination. That witness informed appellant that deceased was pregnant and that appellant then requested witness to perform an abortion on deceased, which witness refused to do; that appellant insisted upon witness performing an abortion and helping him (appellant) out of his trouble, and, upon witness' continued refusal, appellant said he would perform the job himself if he had the tools. To all of this testimony counsel for appellant objected upon the ground that it was irrelevant, incompetent, and immaterial, and was calculated to prejudice the jury against appellant. The court overruled this objection and admitted the testimony, to which ruling counsel for appellant objected.

W. N. Bickel, being upon the stand as a witness for the state, was asked the following question:

"I will ask you to state to the jury whether or not, prior to the 9th of November, 1910, you had a conversation with the

defendant and in which conversation he spoke to you something about his having studied medicine? Mr. Swindall: Objected to as incompetent, irrelevant, and immaterial; he is not on trial for studying medicine. By the Court: Overruled. (The defendant excepting.) Q. You may state, what, if anything, he said to you at that time? A. He told me that, when he was a young man, he had studied medicine sufficient to have been admitted to practice had he pursued that line."

In their brief and in the oral argument made when the cause was submitted, counsel for appellant bitterly objected to the reception of this testimony, claiming that it related to a separate, independent, and distinct offense from that for which appellant was upon trial, and was highly calculated to inflame the minds of the jury and prejudice them against appellant.

In the case of *Vickers v. United States,* 1 Okla. Cr. 452, 98 Pac. 435, in a well-considered opinion by Judge Doyle, this court held that evidence is admissible which tends to prove the defendant guilty of the crime for which he is upon trial, and even though it may also prove, or tend to prove, another distinct felony and thus prejudice the accused. We think that this is unquestionably correct. Upon a trial for murder, the motive, or want of motive, upon the part of the defendant for the commission of the crime is always a material question to be considered by the jury. An examination of the reported cases will show that illicit relations between the sexes has always been a most prolific source of murder. For a full presentation and discussion of our views upon this subject, see *Burns v. State,* 8 Okla. Cr. 554, 129 Pac. 657; *Ex parte Harkins,* 7 Okla. Cr. 464, 124 Pac. 931; *Ex parte Jefferies,* 7 Okla. Cr. 544, 124 Pac. 924, 41 L. R. A. (N. S.) 749. Illicit love will sink its victims to a greater degradation and prompt the commission of more desperate deeds and unjustifiable crimes than any other passion to which poor erring mortality is the slave.

We think that the state could not have proven a more powerful motive upon the part of appellant to kill the deceased than by proving that illicit relations had existed between them

during the time when appellant was estranged from his wife, and that, after appellant had become reconciled to his wife, he discovered that the deceased was pregnant as a result of their illicit relations, and after he had failed to induce a physician to produce an abortion upon the deceased, and he knew that unless the deceased was disposed of, their secret and shame would soon become public. We therefore think that all of the evidence on that subject, while it did prove a separate offense upon the part of appellant, yet it was pertinent to the charge for which he was upon trial and was therefore properly admitted by the court. The testimony that appellant was familiar with medical science also tended to explain the unusual manner in which the death of the deceased was effected. The court, therefore, did not err in admitting this evidence.

Third. Appellant complains at the action of the trial court in refusing to give a number of special instructions requested. With one exception, all of the propositions presented by counsel for appellant, with reference to the instructions, have been previously passed upon by this court adversely to the contentions made. It is therefore not necessary to discuss them again. The instruction referred to as constituting the exception is as to the effect and weight that should be given to the testimony of experts. The instruction requested is argumentative and highly calculated to confuse the minds of the jurors who are not supposed to be learned in the law. The court, therefore, did not err in refusing to give the instruction requested by appellant upon this subject.

The court did, however, instruct the jury upon this question as follows:

"Gentlemen of the jury, the court has permitted expert testimony to be given in the trial of this case and in this connection the court instructs you that the opinions of expert witnesses are to be considered by you in connection with all other evidence in the case. You are not to act upon such opinion to the exclusion of other testimony. In determining the weight of the testimony of expert witnesses, you are to apply the same general rules that we applied to the testimony of

other witnesses. Taking into consideration the opinions of the expert witnesses, together wth all other evidence, you are to determine for yourselves, from the whole evidence, whether it establishes the guilt of the defendant beyond a reasonable doubt, as charged in the information."

We think the instruction given by the court is correct.

Fourth. It was proven that the body of the deceased was found in a back room adjoining defendant's office about 2 or 3 o'clock in the afternoon. It was also proven that the deceased was a robust, healthy girl about 23 years of age, and that she left her father's house that morning to go to the office of appellant, at which she was employed, and that she did not go home for dinner. Appellant was proven to have been at his office about 12 and also at about 1 o'clock on the day of the homicide. About 2 or 3 o'clock the father of the deceased, passing near the office of appellant, was called by appellant. Upon entering the office, appellant informed the father of the deceased that he believed that his daughter was dead. He then carried the father of the deceased to the room in which the body was lying and stated that this was the position in which he had found her. The father of the deceased examined the corpse and found that there was yet some warmth about the heart and that the body was in the condition described by the attending physicians. The father of the deceased also testified that during the month of September he had stated to appellant that he wanted his girl to quit working for appellant, but that appellant replied he did not want her to quit at all; that he and the deceased intended to get married. Appellant stated that he and his wife had separated and that he was going to get a divorce. The record covers nearly 800 pages and contains many other facts showing the relations existing between appellant and the deceased of a similar nature to those hereinbefore stated in this opinion.

Fifth. Appellant's counsel complained of certain alleged improper remarks claimed to have been made in the closing argument of counsel for the prosecution. Upon an examination

of the record, we find that the only reference to this matter is contained in some remarks made by one of the counsel for appellant after the argument was over and before the jury had retired to consider their verdict. The record does not contain a certificate of the trial court that the prosecuting attorney used the language which he was charged with having used by counsel for appellant. We have time and again decided that improper remarks made by a prosecuting attorney in his argument to the jury must be incorporated in the case-made and certified to by the trial judge before they can be considered upon appeal. Such remarks cannot be presented by affidavits or in any other manner than under the certificate of the trial judge, unless it appears from the record that counsel for the defendant requested the trial judge to have such remarks taken down by the stenographer, in order that he might incorporate such remarks and his objections thereto in the record; and the court had refused to have this done. In that event only can such remarks be presented to this court upon appeal by affidavit. If it had been made to appear by the record that counsel for appellant had requested the trial court to have the stenographer take down in shorthand any statement made by the prosecuting attorney during his closing argument to be made a part of the case-made upon appeal, and that the court had refused to comply with such demand, then this fact might have been shown by affidavits or any other competent evidence, and such refusal upon the part of the court would have been ground for reversal, without regard to the merits of the case. But it is not claimed that any such request was made by counsel for appellant or refused by the trial court, and, as the court has not certified to the statements contained in the record made by counsel for appellant, we cannot consider such statements as a part of the record. See *Lamm et al. v. State*, 4 Okla. Cr. 641, 111 Pac. 1002.

Sixth. If we were to state all of the evidence in this case, it would fill a volume of our reports. It is not necessary that

the evidence should be stated in full. We think from the statement of facts contained in this opinion, in connection with the other evidence in the case which appears in the record, that an honest and intelligent jury could not be impaneled who, with a due regard for the evidence and their oaths, could do otherwise than convict appellant of murder. In fact, his acquittal would have been a great miscarriage of justice. We regard this as the most cold-blooded, cowardly, and infamous murder committed in Oklahoma to which our attention has been called. To gratify his animal passion and under promises of getting a divorce from his wife and marrying deceased, appellant, in the sacred name of love, laid seige to the citadel of the heart of a young and inexperienced girl and accomplished her ruin. His own statements conclusively show that he alone is responsible for her seduction, and, when he learned that, as a result of her defilement, she was about to become a mother, and being unable to induce a doctor to perform an abortion and cover up his treachery and infamy, he in a cowardly manner deliberately strangled her to death.

Appellant had stated that he kept whisky in his office to give to the deceased when she had sinking spells. He doubtless gave her whisky on the day of the homicide containing enough morphine to stupify and not to kill her, the better to enable him to strangle her to death without causing her to call for assistance. The presence of strychnine in the stomach would give color to appellant's claim that deceased had sinking spells and suggest the idea that this came from medicine which she had taken to strengthen her heart. This makes the testimony that appellant had read medicine clearly admissible. It strengthens the presumption that appellant was preparing to cover up his tracks and manufacture a defense.

We believe that the gallows was cheated of its due when the jury failed to inflict the death penalty upon appellant. The protection of female purity requires that such conduct as appellant has been guilty of should receive the most severe possible punishment.

We find no material error in the record. The judgment of the lower court is therefore in all things affirmed.

ARMSTRONG, P. J., and DOYLE, J., concur.