## L. L. HOWARD v. STATE.

No. A-5891. Opinion Filed March 17, 1928.

(265 Pac. 149.)

Morgan & Morgan and Brown, Brown & Williams, for plaintiff in error.

Edwin Dabney, Atty. Gen., and J. H. Lawson, Asst. Atty. Gen., for the State.

EDWARDS, J. The plaintiff in error, hereinafter called defendant, was convicted in the district court of Carter county of manslaughter in the first degree, and his punishment fixed at confinement in the state penitentiary for a term of 25 years.

A brief summary of the facts disclosed by the record are about as follows: On April 18, 1925, defendant and his wife resided in the family of the wife's father, Joe Pearson, at the town of Hewitt. Some two years or more before that time, prior to the marriage of defendant, Pearson had lived on a farm belonging to Andrew Greenwood, the deceased. During the time he resided there, on one occasion deceased and defendant had a quarrel. On the day of the homicide Greenwood and Ed Glenn went to the Pearson home, and, when they arrived there, Alton Lightsy and

a daughter of Pearson were in front of the home in an auto-mobile. Glenn and Greenwood drove up near, and remained in their car for some little time. Pearson and his wife came out, and the parties talked together apparently entire-ly amicably. Defendant and his wife were away from home at the time, and soon came in walking, and, as they passed, Greenwood spoke to defendant, and, after he had gone into the house, called to him and said he wanted to see him. Defendant came out of the house, and walked in between the two cars, and the evidence is that Green-wood, who was in the car, laid his hand on his shoulder, and defendant began immediately cutting him with a large knife, inflicting three wounds, from which Greenwood died the following day. Greenwood was in his shirt sleeves, and unarmed. There was evidence that he had been drink-ing, and evidence that he had made threats against de-fendant.

Glenn testified that, after defendant passed into the house, Greenwood said he wanted to talk with him; that de-fendant came out of the house, around back of Lightsy's car, which was two or three or four feet from Glenn's car in which deceased was sitting, and said: "What do you want, Andy?" (referring to deceased). Deceased said: "I just want to talk with you, Karo" (a nickname for de-fendant), and laid his hand on his shoulder. When he did, that defendant struck him three times with a knife; that deceased did not attempt to get out of the car.

Lightsy, who was in the other car, testified for defend-ant, in substance, that he was in a car with Pearson's daughter; that Greenwood and Ed. Glenn drove up in an-other car, and stopped about five or six feet from him, and Pearson and his wife came out, and the parties talked, and then defendant and his wife came up and went into the house, and, after they got to the house, Greenwood called to the defendant, and asked him to come out—that he

wanted to see him; that he did not hear them say anything further, and did not see the blows struck.

Defendant testified: That there was a state of ill feeling between deceased and himself. That he had learned of threats made by the deceased, and that he had several times left places to avoid trouble; that on the day of the homicide he and his wife came home and passed deceased and Glenn in a car, and Lightsy and the Pearson girl in another. As they went into the house, deceased spoke to him, and he nodded in response. After he had gotten into the house, he heard deceased call, and Mr. Pearson said that Andy called him. That he went out and said: "Now listen, Andy," and deceased threw his hand out, grabbed him, and started to pull him up to him, and he got out his knife and started to cut him. That he could not see his hand or what he was doing, and did not know what he had in his hand. On cross-examination he said:

"* * * Q. And still you knew on this occasion you had to kill him to keep him from doing you bodily harm? A. No, sir; I didn't mean to kill him. Q. You stated a while ago you cut him because he hit you or took hold of you. A. I didn't cut him because he caught me. I cut him because I didn't know what he was going to do to me, and I felt like my life was in danger. Q. He had caught hold of you? A. I felt him. Q. He had caught hold of you before you cut him? A. Yes, sir. Q. You knew he didn't have anything in his hand? A. I didn't know it. Whenever he grabbed me to him, I cut him. Q. In other words, when he reached his hand out there on you, you cut him? A. If you had been there, you wouldn't have thought he laid his hand on you. Q. You already had this knife ready? A. I got it ready while he was fixing to grab me. Q. He waited a while before he grabbed you? A. I walked up, and he reached out for me, and whenever he did I stuck him. * * * Q. You were mad when you went out there? A. Yes, sir; I was mad. Q. How long before this cutting affair was it that you had seen Greenwood—how long before that? A. Well, I suppose it has been eight or ten months, or something like that. * * * Q. Greenwood

made no effort to get out of this car? A. Yes, sir. Whenever he went to get me he raised kind of up towards me. Q. That is the only act of getting out of the car that you saw him do? A. Yes, sir. * * *"

The evidence of the state, we think, clearly makes out a case of manslaughter in the first degree, and the evidence of defendant discloses an unnecessary homicide without any sufficient provocation or reasonable ground for apprehension that deceased was about to take his life or do him any serious bodily injury.

It is first contended that there was misconduct of the counsel for the state prejudicial to the right of defendant. This is directed at questions propounded to defendant on cross-examination concerning some difficulty he had had with his father-in-law. This line of questioning was improper, but the record fails to show that any objection was made to it.

Attached to the motion for a new trial is an affidavit of one of defendant's counsel that John B. Ogden, special counsel for the state, in the course of his argument, made the statement that defendant had abandoned his wife and had taken a pistol and run the father of his wife away from home. There is no showing in the record that exceptions were made to this argument, or that counsel requested it to be taken down by the court reporter, or that there was any request that it be stricken and withdrawn from the jury. When improper argument is made, it is the duty of counsel to object at the time, and to request the trial court to have a stenographer take down in shorthand the objectionable statements; then, if the court refused, the statements may be shown by affidavit. The matter must be presented to the court at the time, and he be given an opportunity to rule upon the matter. Unless this is done, the matter is not properly before this court. Irvine v. State, 10 Okla. Cr. 4, 133 P. 259; Miller v. State, 9 Okla. Cr. 255, 131 P. 717, L. R. A. 1915 A, 1088; Brannon v. State, 33

Okla. Cr. 206, 243 P. 259; Smith v. State, 34 Okla. Cr. 318, 246 P. 883.

It is next argued that the trial judge made statements in the presence of the jury tending to discredit the testimony of defendant's wife. It appears defendant had invoked the rule excluding the witnesses, and, when the wife was called, objection was made that she had violated the rule and remained in the courtroom. Upon preliminary examinations, it appeared that this witness had violated the rule, and had heard a part of the state's testimony. The court stated to go ahead and take her testimony, but that no other witness would be permitted to testify who had violated the rule. The court was in error in making this statement, but we fail to see how it was materially prejudicial. Defendant having invoked the rule, and the wife being a most material witness, they should have seen that she was duly excluded. There is nothing in this proceeding that affected the fairness of the trial.

Complaint is next made of errors in the court instructions Nos. 14 and 15. Although the trial judge permitted counsel to note exceptions after the conclusion of the trial, which appear on five of the instructions, no objections or exceptions are indorsed on either instruction 14 or 15. They are not so fundamentally erroneous as to require a reversal. Where no objection is taken to the instructions of the trial court, they will not be examined by this court for the purpose of discovering other than fundamental error. Russell v. State, 17 Okla. Cr. 164, 194 P. 242; Stiles v. State, 39 Okla. Cr. 173, 264 P. 226.

Finally, it is argued that the court gave an oral instruction upon the subject of the unwritten law. It is, in substance, that in this state there is no such thing as the unwritten law, and that the jury are to be directed and guided by the instructions of the court which embody the written law of the state applicable to the case on trial. Exceptions were taken to this supplemental instruction,

not because it was oral, but of its substance. We condemn the giving of oral instructions. It is contrary to the statute, and, where exceptions are taken to the giving of oral instructions, this court will scrutinize them closely, and, where it appears that they are erroneous and prejudicial to the defendant, we will unhesitatingly reverse a case for that reason. Counsel for an accused on trial, however, also owe a duty to the court to except and preserve the record according to the rules of law so that matters objected to may properly be presented to this court for review. When that is not done, they waive error other than fundamental error.

Opon a consideration of the whole case, it appears that the defendant, even upon his own testimony, is guilty of manslaughter in the first degree; that there is no miscarriage of justice; and that the assignments of error argued do not require a reversal.

The case is affirmed.

DOYLE, P. J., and DAVENPORT, J., concur.