## MACK CLAYCOMB v. STATE.

No. A-3710.   Opinion Filed Jan. 2, 1923.
(211 Pac. 429.)

(Syllabus.)

1. **Names—Idem Sonans—Names of Witnesses Incorrectly Spelled in Indorsement.**—The doctrine of "idem sonans" may apply where the names of foreign witnesses are incorrectly, but phonetically, spelled in the indorsement on the information and in the list of witnesses served on the accused.

2. **Trial—Rebuttal Testimony Proper, Although Portions Might Have Been Introduced in Chief.**—Rebuttal testimony tending to clarify disputed points may be introduced, although portions of such rebuttal testimony might have been introduced in chief.

3. **Witnesses—Discretionary to Permit Leading Questions to Witnesses Speaking English Imperfectly.**—Where witnesses speak the English language imperfectly, it is within the sound discretion of the trial court to permit leading questions to be propounded on direct examination.

4. **Courts—Interpreter not Incompetent on Account of Relation to Witness or Party.**—One is not necessarily rendered incompetent to act as an interpreter merely because he is related to the witness or because of friendly relations with either party.

5. **Same—Interpreter Disqualified by Showing Him Incapable or Unreliable.**—An interpreter may be disqualified on direct or on cross-examination, or by independent testimony, showing that the interpreter is incapable of translating or is unreliable.

6. **Homicide—Instruction on Insanity—Sufficiency.**—Instructions of the court to the jury relative to the alleged insanity of the

7. **Trial—Misstatement of Law in Prosecutor's Argument—Cure by** accused examined and found sufficient.
   **Court's Correction.**—A misstatement of the law by the county at-

torney in his argument to the jury, which was promptly corrected by the court, was without prejudice to the accused under the circumstances here.

Appeal from District Court, Latimer County; E. F. Lester, Judge.

Mack Claycomb was convicted of manslaughter in the first degree, and he appeals. Affirmed.

L. V. Reid, C. C. Null, and R. P. White, for plaintiff in error.

S. P. Freeling, Atty. Gen., and E. L. Fulton, Asst. Atty. Gen., for the State.

BESSEY, J. Mack Claycomb was by information filed in the district court of Latimer county on September 1, 1919, charged jointly with Mrs. Mack Claycomb and Jewell Claycomb with the murder of Jessie Fitzgerald on May 31, 1919. At the trial the jury returned a verdict of manslaughter in the first degree against Mack Claycomb, assessing his punishment at confinement in the state penitentiary for a term of 25 years. From a judgment on the verdict defendant appeals.

Mack Claycomb, plaintiff in error, referred to herein as the defendant, was a Mexican, as were nearly all of the witnesses. It was claimed that about three weeks before the fatal difficulty, while the defendant and his son Jewell were absent from home, the father of the deceased stopped at the home of the defendant and made improper proposals to defendant's wife, who was there alone. For this the defendant caused the arrest of the father of the deceased, and at the preliminary hearing the father was discharged. The father and sons then threatened to proceed against defendant's wife for slander, and they had several heated discussions concerning the incident. The defendant and members of his family gave evidence to show that the father and sons threatened

to prosecute the defendant for slander in order to cause him and his family to leave the country; that they several times went to the home of the defendant and made threats towards the defendant and his family—all of which the father and sons denied.

Defendant claims that on Saturday night, at about 9:30 o'clock, the deceased approached defendant's home, and when about eight steps from the door, while abusing defendant's wife and while still advancing towards the door, defendant seized his shotgun and, to prevent deceased from entering his home, shot him twice; that he remembered seeing the deceased fall in the public road east of his house, but did not remember firing a third time.

The evidence on the part of the state indicates that after, or possibly before, the first shot, the deceased was retreating; that after shooting the deceased twice, defendant called to his son for more shells, and he reloaded his gun and shot deceased a third time, deceased falling mortally wounded after the third shot, about 100 yards from where the difficulty began. The deceased was in his shirt sleeves and unarmed. The fatal shot crushed the side and top of his skull, so that a part of his brains oozed out on the ground where he fell.

The defendant claimed he was justified in the shooting on the ground of self-defense and the defense of his home and family, and also pleaded temporary insanity brought on by the relations between himself and the deceased and his family prior to the tragedy.

A number of alleged errors are urged as reasons why the verdict should be set aside. These may be summarized as follows:

(1)   That witnesses were permitted   to   testify whose names had not been indorsed on the information and of whose testimony defendant had no notice.

(2)   Improper reception of testimony elicited by the prosecutor's repeatedly propounding leading questions to witnesses for the state.

(3)   Alleged error in overruling objections to the translations of an interpreter.

(4)   Alleged erroneous instructions to the jury.

(5)   Misconduct of the prosecutor in his argument to the jury.

Among the many names indorsed on the information as witnesses in this case were "Saudda," "Bahulkgs," "Gonzl," "Tabela," "Fabra," and "Ewicts," all names difficult for English-speaking people to spell or pronounce. A witness, Mary Sabala, was called by the state, whereupon an objection was interposed by defendant because no such name was indorsed on the information and no notice given that such a witness would be called. It developed that one Mary Fabra, who was a witness at the preliminary hearing, was the person intended to be called, but that for some reason her name was not indorsed on the information or in the list of witnesses as such. The court then excused this witness. Another witness was called, who said her name was Salome Sancedo. She could not spell her name in English letters. The name indorsed on the information was Salome Saudda, and it was also so written in the list of witnesses. The best that could be done was to spell the name phonetically; hence the discrepancy. The defendant was not misled, so far as the record shows, and the objection to this witness' testimony on the ground urged was purely technical. The court committed no error in

permitting her to testify. The doctrine of idem sonans applies under such circumstances. 19 R. C. L. 1334; 2 Words and Phrases, Second Series, 928.

Defendant also contends that much testimony was permitted to be introduced in rebuttal that should have been introduced in chief. The witness Mary Sabala, indorsed on the information as Mary Fabra, was called to testify in rebuttal. She testified as to the place where the deceased and the defendant and his wife stood when the shooting took place, designating different positions than were testified to in the account given by defendant and his witnesses. She also testified that Mrs. Claycomb was talking, but that she could not understand what she said. Portions of this testimony and that of other witnesses called on rebuttal related to matters controverting the testimony given by defendant, dovetailing in with facts that could have been introduced in chief. Rebuttal evidence is proof of facts tending to explain, repel, counteract, or disprove matters given in evidence on the other side. 3 Bouvier's Law Dictionary, p. 2820.

Evidence tending to clarify a disputed point may be properly rebuttal testimony, notwithstanding the fact that the same testimony might have been introduced in chief. Wigmore on Evidence, § 1873.

Defendant complains further that there was prejudicial error in the repeated reception of testimony elicited from the state's witnesses by the prosecutor by means of leading questions asked the witnesses. It has often been held that the permitting of leading questions is within the sound discretion of the trial judge, where, as in this case, the witnesses converse with difficulty in the English language. 28 R. C. L. 589.

In People v. Brown, 273 Ill. 169, 112 N. E. 462, Ann. Cas. 1918D, 772, the court said:

"It is contended that the court erred in permitting the state's attorney to ask leading questions. The witnesses were not Americans and were acquainted only with the language of their nativity and testified through an interpreter. There was some difficulty in getting direct and intelligible answers, and some of the questions in terms directed attention to the subject-matter concerning which they were called to testify. We do not find any question which indicated the answer desired, and the rulings were evidently for the purpose of expediting the trial. The matter was largely in the discretion of the court, and there was no improper ruling."

For the most part, the answers to the leading questions, if indeed they were leading, were not prejudicial, for the reason that these questions did not have any reference to the plea of insanity and only a remote bearing upon the plea of self-defense. The testimony of the defendant and his own witnesses showed that the deceased was shot three times on the public highway, and that he fell, mortally wounded, about 100 yards from where the difficulty commenced. The deceased was unarmed, and the testimony on both sides indicated that so soon as the deceased saw the defendant with the shotgun he rapidly retreated. Under such circumstances, defendant suffered no disadvantage by reason of the questions complained of, even if it be conceded that the court did permit improper leading questions to be propounded.

It is next contended that there was error in permitting certain witnesses to give their testimony through an interpreter, particular objection being made to the examination of the witness Mrs. Enoch Warner in this manner. Mrs. Warner was a Mexican woman who spoke the English language imperfectly, and she had testified at some length, when it was suggested that better progress could be made by calling in an interpreter; whereupon her husband, Enoch Warner, was called and sworn as an interpreter. The defendant objected to

the husband acting as interpreter for the reason that he him-self was a witness, that he spoke the English language imperfectly also, and that his interpretation might be his own testimony rather than that of his wife. At this time Enoch Warner had already appeared as a witness, and the court had opportunity to observe his ability to understand the English language, and the objection was by the court overruled. The examination of Mrs. Warner then proceeded, aided by the interpretations made by her husband. Defendant says this was error as a denial of his right to be confronted with the witness against him and a denial of his right to properly cross-examine the witness. There was some confusion and difficulty in eliciting answers from the witness through the interpreter, during which the court interrupted counsel and said:

"The trouble is that the attorney isn't directing his interrogations through the interpreter to the witness; it seems that he is directing them to both of them, and therefore it is confusing."

The defendant then again objected to the interpretation, but made no further showing and no offer to show that this interpretation was incorrect or that the interpreter was incompetent. One is not rendered incompetent to act as an interpreter because he is related to the person whose evidence he is called upon to interpret, or because of friendly relations with either of the parties. State v. Burns (Iowa) 179 N. W. 843; People v. Rardin, 255 Ill. 9, 99 N. E. 59, Ann. Cas. 1913D, 282. People v. Ramirez, 56 Cal. 533, 38 Am. Rep. 73; State v. Michel, 20 Wash. 162, 54 Pac. 995; notes L. R. A. 1916F, 1206.

The defendant undoubtedly had a right to show, if he could, by direct examination or by independent testimony, that the interpreter was incapable of translating the Mexican language into the English language, or that the interpretations

made were incorrect; but the record discloses no sufficient showing of this character.

It is next contended that the court erred in giving certain instructions to the jury, and in refusing to give instructions offered by the defendant. The court submitted 43 separate instructions, covering every phase of the evidence introduced. These instructions, separately and as a whole, were clear and concise and favorable to the defendant. Some of the instructions considered separately did not cover all the law relating to the subject treated in the particular instruction, but the jury were admonished that they must consider the instructions as a whole, so that any parts omitted in any single instruction were properly incorporated in other instructions.

Defendant calls our attention to the case of Adair v. State, 6 Okla. Cr. 284, 118 Pac. 416, 44 L. R. A. (N. S.) 119, touching upon the question of temporary insanity. In the Adair Case it was held error to have refused to give the following instruction:

"Gentlemen of the jury, you are instructed that the defendant has interposed as one of his defenses in this case the plea of insanity. When that defense is interposed, the burden of proof is upon the defendant to introduce sufficient evidence to raise in your minds a reasonable doubt of his sanity. It is not required that the defendant shall prove his insanity to the satisfaction of the minds of the jury by competent evidence beyond a reasonable doubt, or by a preponderance of the evidence. It is sufficient if he only introduces sufficient evidence to raise in your minds a reasonable doubt of his sanity, and when this is done you are instructed that the burden of proof is upon the state to prove the sanity of the defendant by competent evidence, beyond a reasonable doubt, before you would be justified in convicting the defendant as charged in the indictment, and then the burden of proving the sanity of the defendant rests upon the state, like that of proving any other material allegation of the indictment;

and if you believe that the state has failed to prove by competent evidence, beyond a reasonable doubt, the sanity of the defendant, and if from all the evidence in the case there is a reasonable doubt in your minds as to the sanity of the defendant, you will return a verdict of not guilty and acquit the defendant.''

In the instant case, instruction No. 23 given by the court was copied almost verbatim from the instruction just quoted, with the addition of the following:

"You are further instructed in this connection that an insane person is not responsible criminally for his acts. The test of criminal responsibility for acts which would be crime under the law is 'the mental capacity to distinguish between right and wrong as applied to the particular acts, and to understand the nature and consequences of such act, or knowing its wrongfulness'; defendant is not criminally responsible if by reason of insanity he did not have the will power to refrain from committing such act."

We think the instruction as given meets the requirements set forth in the Adair Case. To attempt to give an abstract definition of insanity would be dangerous. The court, in the Adair Case, quotes with approval from Bishop's New Criminal Law (8th Ed.) § 381, and from Ray's Medical Jurisprudence, Insanity, § 22, as follows:

"Many attempts have been made to discover, what has been assumed to exist, a form of words, termed a test of insanity, which, put into the hands of jurors, can be used by them as a sort of legal yardstick to measure the evidence and determine whether or not the prisoner had sufficient length of mental alienation to escape responsibility for his act. But the test has never been found, not because those who have searched for it have not been able and diligent, but because it does not exist.

"The symptoms of * * * insanity are so variable, and its pathology so complex, that no two cases may be just alike.

The fact of its existence is never established by any single diagnostic symptom, but by the whole body of symptoms, no particular one of which is present in every case."

Under the circumstances in this case no additional instruction by the court would have materially aided the jury in determining whether or not the defendant was insane at the time of the homicide.

Defendant contends that the prosecuting attorney in his argument to the jury misstated the law as incorporated in the instructions. In the course of the argument the prosecutor and the court spoke as follows:

Mr. Jones: The court tells you that the burden is on the defendant to show by competent testimony beyond a reasonable doubt that he is insane, and then it shifts to us to show his sanity—

The Court: The court desires to correct the statement of counsel that it is the duty of the defendant to show beyond a reasonable doubt that he is insane.

Mr. Jones: The burden is upon the defendant to raise in your minds a reasonable doubt of the sanity of the defendant—that is the charge of the court.

The Court: But you used the term "beyond a reasonable doubt."

Mr. Jones: The burden of proof is upon the defendant to introduce sufficient evidence to raise in your minds a reasonable doubt of the sanity of the defendant. Gentlemen of the jury, where is there any evidence in this case to raise any reasonable doubt of the sanity of Mack Claycomb? He was sane enough to be there at work in the garden at home, according to the evidence of the family; he was sane enough, men, to have his shotgun ready and have it loaded; he was sane, men, sane enough when his ammunition gave out to tell the boy to bring him more ammunition; he was sane enough to follow that boy off north down there 200 yards and shoot

him and come back the same road he went, and join his family; and the proof is by them themselves that he said to the family, "Now, get ready and we will all go over to the bank." Where is the evidence of insanity, or that he had lost his reason?

True, the prosecutor, either purposely or inadvertently, did misquote the law; but the court very promptly corrected him, thus calling the jury's attention to the law as given by the court, rendering this error harmless. As to whether or not the facts disclosed in evidence justified the conclusion that the defendant was insane, the prosecutor had a right to refer to the evidence and draw his own deductions from such evidence. The jury might or might not agree with these deductions. Jones v. State, 20 Okla., Cr. 233, 202 Pac. 187.

The verdict of the jury was amply supported by the evidence. There was no evidence indicative of insanity on the part of the defendant excepting his own statement that after the second shot was fired he suffered a lapse of memory for a short interval and that he did not remember firing the third shot, though he did remember seeing the deceased fall at the conclusion of the difficulty.

The judgment of the trial court is affirmed.

DOYLE, P. J., and MATSON, J., concur.