## E. P. MERRICK v. STATE.

No. A-8653. June 8, 1934.
Rehearing Denied July 12, 1934.
(34 Pac. [2d] 281.)

Freeling & Box, for plaintiff in error.

J. Berry King, Atty. Gen. and Smith C. Matson, Asst. Atty. Gen., for the State.

EDWARDS, P. J. Plaintiff in error, hereinafter called defendant, was convicted in the district court of Oklahoma county of manslaughter in the first degree and his punishment fixed at five years in the state penitentiary. The defendant contends: First, that the evidence does not sustain the verdict; second, that defendant at the time of the shooting was insane; third, prejudicial errors in the instructions: fourth, error in overruling motion for new trial. These assignments will be considered in the order presented.

At the time charged, at a filling station just north of the State Capitol, defendant shot one Henry Downs, inflicting wounds which resulted in death two days later. Five shots were fired, two of them through the door of the ladies toilet; deceased fell inside this toilet. A brief summary of the evidence leading up to and concerning the homicide is about as follows:

On the preceding day deceased, a young man about twenty-five years of age, with a brother of defendant, arrived at Oklahoma City. There the brother arranged to take deceased to the home of defendant where they had supper and planned to spend the night. Some time after

supper they went away and were gone several hours and later in the night returned and retired. Deceased and young Merrick were assigned a front room. Defendant and another brother were to sleep in a back bedroom, the wife of defendant and a small daughter were in another bed in the same room, about three feet from that occupied by defendant. About 4:30 in the morning defendant was wakened by an outcry from his wife. The light was turned on and deceased was discovered on or about the wife's bed. She then told defendant that deceased had been in the bed with her and had made advances. The brothers of defendant took deceased out of the room while defendant threatened to kill him, and attempted to do so, but ended up by ordering him off the premises and to leave town with the threat to kill him if he did not do so. The shooting occurred about 3 p. m. the following day. Defendant was out of the city in the forenoon. He returned about 1:30 p. m. and was informed deceased had not left town. He took his wife in an automobile, drove to the station where he had been told deceased was about an hour before. So far there is no material conflict in the testimony. As to what took place at and immediately following the shooting, there is some conflict. Defendant testified he went into the filling station for the purpose of using the toilet. He found some one in the men's side and turned around and discovered deceased near the entrance of the ladies' side; that deceased made a "slurring grin" and that he threatened to "stomp hell" out of him; that deceased then struck at him and he struck back and deceased then kicked at him—that he pulled his gun intending to knock deceased down but did not intend to shoot, that in striking he lost his balance and was about to fall backward and fired as deceased was again about to kick him.

The witness Crowe, for the state, testified in substance he was at the filling station at the time of the shooting; that he went into the men's toilet to wash and change shirts; that defendant came to the door and upon discovering him there, stepped away and in a few seconds he heard several shots; that he then came out, saw defendant and on this point, testified: "Q. What did he say? A. He says, I will learn the son of a bitch how to try to rape my wife."

The witness Abernathy, a deputy sheriff, who arrested defendant a few minutes after the shooting, testified:

"Q. When you went up there did you have a conversation with Mr. Merrick, the defendant? A. Yes. Q. What did he say? A. Mr. Sanders and I went in the station, seen what had happened, and I asked where the man was that did the shooting. Mr. Merrick stepped up and said he had, and handed me the gun and the clip. * * * Q. I will ask you to state whether or not Mr. Merrick gave any reason for the shooting. A. Yes. Q. What was it? A. Says, 'I caught this man in bed with my wife.' Q. Did he say anything else in regard to that? A. Says, 'I told him to leave town, and I caught him over here in his brother's station.'"

The witness Montcrief, for the state, attendant at the station, on this point testified:

"Q. What was Henry Downs doing then? A. He was sitting there with a paper in his hand. * * * Q. Sitting there with a paper in his hand? A. Yes sir. Q. All right. What did Mr. Merrick do then? * * * A. Slapped the paper with his left hand, or grabbed it, I don't know which, hit it down with his right hand. Q. That is this defendant? A. Yes, sir. Q. Did he say anything when he did that? A. Yes, sir. Q. What did he say? A. Says, "God damn, you will try to break up my home.' Q. All right. Then what was the next thing that you saw? A. When he struck at Downs,

Downs jumped to his feet and I thought struck at Merrick. * * * Q. All right. Then what was the next thing you saw? A. Mr. Merrick threw up his left hand, I suppose to guard the lick off, and reached for his gun. * * * A. He jerked the gun out of his way (illustrating) and as he did so I grabbed his arm. Q. What did Merrick do? A. Kind of whirled around, not completely around but gave me a shove like that, shoved me back a step or two. I went right on out the door. * * * Q. How many shots did you hear? A. I heard five. * * * Q. (By Mr. Morris) Well, did Downs have a weapon in his hand? A. Not that I saw. * * * Q. Did you see Henry Downs? * * * A. I saw him later, yes, sir. Q. Where was he? A. He was in the ladies' toilet."

The witness Myers, for the state, testified:

"Q. What were you doing there? A. Henry had just bought a newspaper and we had divided it and I was reading half of it and he was reading half. * * * Q. Were you standing in the door when you first saw the defendant? A. Yes, sir, I was in the door. * * * Q. Then what happened? A. The next thing I heard, I turned around and the men were in a scuffle. * * * Q. All right. And what were they doing? A. And their hands were in the air, kind of in a scuffle, and a gun was in the air. Q. Who had the gun? A. Mr. Merrick. * * * Q. Now, when you started to leave what was Mr. Downs doing? A. I took a step forward, to leave the station and as I did I hesitated and looking back I saw Mr. Downs had made a step towards the ladies' rest room. * * * Q. Did you hear a shot? A. I heard two shots before I was off of the drive; that was the filling station drive. Q. Did you hear any more? A. Then there was a pause and I heard three more shots. By that time I had crossed the street and was over at the other filling station. * * * Q. Did you go back after the ambulance had arrived? A. Yes, sir. Q. Where was he? A. The first time I saw Mr. Downs, he was in the ladies' dressing room."

The state argues that deceased did not attempt any liberties with the wife of defendant but advances the theory that being in a strange house, sleepy, and exhausted, he went from his bed to the toilet and in attempting to return stumbled into the wife's bed. It further contends that whatever may be the truth of that circumstance the shooting was an act of vengeance for a wrong committed or supposed to have been committed by deceased. The above resume of the evidence disposes of the contention that the verdict is not supported, for it is clear there is ample testimony from which the jury could logically and reasonably conclude that defendant, on learning deceased had not left the city as he had ordered on the preceding night, sought him out, provoked the difficulty, and killed him as deceased attempted to escape by going into the ladies' toilet.

The second and third assignments of error which are directed to the question of insanity and the instructions are discussed together. Defendant introduced evidence that he was insane at the time of the shooting. Dr. Werner, an expert, testified defendant was a psychopathic, emotionally unstable, and mentally unbalanced. This witness, however, was considerably shaken on cross-examination and admitted defendant may have known right from wrong at the time, would not say he did not, but that he did not have the will power to resist—that any man who kills another over family trouble is insane, although he may know the nature and consequences of his act.

Defendant requested several instructions on insanity. Generally these are argumentative or amount to a comment on the testimony and suggest the defense of temporary or emotional insanity. The court gave the usual instructions which have been several times approved by this

court. Emotional or temporary insanity is the term applied to a mental state whereby an accused seeks to avoid responsibility for a homicide on the ground that, while knowing the wrongfulness of his act, he is without the will power to restrain himself from doing the act which constitutes the crime. This doctrine finds support in the early case of Adair v. State, 6 Okla. Cr. 284, 118 Pac. 416, 44 L. R. A. (N. S.) 119, but the doctrine there announced has been repudiated by this court and the Adair Case criticized and overruled in several cases. Roe v. State, 17 Okla. Cr. 599, 191 Pac. 1048; Tittle v. State, 44 Okla. Cr. 287, 280 Pac. 865; Arms v. State, 49 Okla. Cr. 34, 292 Pac. 76; Carrick v. State, 49 Okla. Cr. 65, 292 Pac. 1053. Under these later cases defendant's contention is untenable. The instructions are free from material error.

Finally complaint is made that one Clifton, who served on the jury, was prejudiced against defendant by reason of a controversy some twelve months previously between the juror and defendant. Defendant asserts that in June, 1932, he was working for the state highway department, checking violations of traffic laws; that he discovered the juror Clifton with a truck without the proper license tag and that he detained the truck for a time until Clifton satisfied him he had a proper tag; that Clifton became angry; that at the time the jurors were examined defendant did not recognize him. The voir dire examination is not in the record but on motion for new trial this juror testified he did not know defendant, never had any business transaction with him, and had no bias or prejudice against him at any time; that his verdict was the result solely of the evidence at the trial. After a full hearing on this point, the trial judge overruled the motion. He was fully warranted in his conclusion on this point.

Upon a careful consideration of the entire record we find no material error. The case is affirmed.

CHAPPELL, J., concurs. DAVENPORT, J., absent, not participating.