Richard Henry DARE, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–13091.

Court of Criminal Appeals of Oklahoma.

Jan. 10, 1963.

See also 370 P.2d 846.

Don Anderson, Public Defender, Maurice Nagle, Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., for defendant in error.

BUSSEY, Judge.

Richard Henry Dare, defendant below, was charged by information with the Crime of Murder, tried by jury, convicted, and sentenced to the punishment of death for the murder of one Ted Harry Albert. From said judgment and sentence, rendered in the Oklahoma County District Court, he appeals.

On the evening of August 6, 1960, officers Donald J. Smith and C. A. Cox, Oklahoma City Police Department, were called to the residence of one Ted Harry Albert, 1737 Southwest 16th Street and were met by Mrs. Ruth Thompson, sister of Ted Albert, who being unable to reach her brother and his family, had summoned them.

Upon arriving at the Albert residence, they learned that the Alberts had not been seen since the day before, August 5th. The doors of the house were locked and Officer Smith, hearing a radio playing inside the house, unlocked a bedroom window screen, raised the window and saw what "looked like two bodies under sheets". Smith radioed for a detective crusier and E. B. Meals, police homicide officer.

Arriving at the scene, Meals crawled through the bedroom window, and upon entering the house discovered the bodies of Patricia Ann Dare and Virgie Albert in the "back" bedroom, the body of Ted Harry Albert in the hall and the body of William McCormick in the "front" bedroom.

The bodies of Virgie Albert and Patricia Ann Dare were covered with sheets and a cord had been securely tied around their necks. The body of William McCormick (with a cord around his neck) had been stripped of his trousers and an empty wallet lay beside him on the floor. Autopsies (performed August 7) disclosed that Patricia Dare and Virgie Albert died as a result of strangulation, and that William McCormick and Ted Harry Albert died as a result of gun shot wounds. Time of death was fixed at 40 to 48 hours earlier, or the afternoon and early evening of August 5th.

Neighbors disclosed that they had seen Richard Henry Dare (defendant) visiting the premises on two different occasions on the day of August 5. After further investigation, an all-points bulletin was issued to arrest and hold the said Richard Henry Dare for investigation of the homicides.

An intensive search of McClain County, Dare's former home, was conducted, and on the 7th of August at 10:00 o'clock in the evening, Sheriff Joe Huddleston of that county received a telephone call from a Mr. Carter (Dare's brother-in-law), and in response to the call drove to the Carter home where Dare surrendered to him. Dare was taken to the McClain County Court House

by Sheriff Huddleston, who gave him a sandwich and then, released him to the custody of Don Cunningham and Jack Mullenix, law enforcement officers, who proceeded to transport Dare to the Oklahoma City Police Department (a distance of approximately 40 miles).

While en route Dare (having been informed of his constitutional rights to remain silent) told Cunningham, "he might just as well go ahead" and tell him about the murders in Oklahoma City. He stated that he had killed his wife, Patricia Ann Dare, his father-in-law, Ted Harry Albert, his mother-in-law, Virgie Albert and his wife's nephew, William McCormick and related the facts surrounding the four slayings. This oral confession, made in the presence of two law enforcement officers during the drive from Purcell (McClain County) to Oklahoma City (Oklahoma County), will be denoted as Confession #1.

The officers and Dare arrived at the Oklahoma City Police department somewhere around 11:00 or 11:30 P.M., Sunday, August 7, where Dare was placed in the custody of E. B. Meals. Dare was taken into the Chief of Detectives Office; informed again of his constitutional rights; asked to repeat his story; and, with his permission, this confession, detailing facts of the four slayings was recorded. The confession made at this time, will be referred to as Confession #2. (The recording of this confession was completed at 12:58 A.M., Monday, August 8, 1960, and witnessed by Officers Meals and Cunningham.)

Dare's account of the slayings was then broken down into four separate statements (each relating to separate homicides) and each was recorded separately. The recorded statement, relating to the death of Ted Harry Albert, was completed at 1:11 A.M., August 8, and we shall refer to this statement as Confession #3.

No question is raised on appeal as to the admissibility of the first confession. Evidence of this statement, given to Officer Cunningham by Dare, while en route to Oklahoma City, was testified to by him (Cunningham) as follows:

"He told us that he had gone over to his mother-in-law's house to talk to his wife about a money problem and when he got over there she asked him for some money and they got into an argument and he was drinking a glass of water and he took this glass tumbler and hit her up the side of the head with it and then they got into a scuffle and she started choking him and he started choking her and he choked her until he thought she was dead, or almost dead, and then he drug her into another room and tied a cord around her neck so that he would be sure that she was dead, then he told me that shortly thereafter her mother came home and he tried to explain to her that he killed her daughter and she became violently angry and she started scratching him, scratched him a few times on his face, and the marks were still on his face, and he said then that he decided that he would just have to kill her too. So he strangled her to death and tied a cord around her neck and put her in the room by her daughters body, then he decided that he,— he said that he decided he best go ahead and finish the job, so he hid behind a divan and waited for the husband, Mr. Albert, to come home about three hours later and shot him with his rifle, and tied a cord around his neck and put him in another room and then his nephew came in and he said the nephew walked in the front door and went to the room where the bodies were hidden, so he decided then that he had to kill the nephew for fear he would find the bodies, so he shot him and tied a cord around his neck and then left."

When evidence of the Second Confession (recorded at the Oklahoma City Police Station) was introduced, defendant objected on the grounds that "this recording purports to disclose the commission of further homicide than the one for which this

defendant is standing trial and that the playing of this record is highly prejudicial to the rights of this defendant." On these same grounds, the defendant urges on appeal that the admission of the second confession constituted error upon the part of the trial court. The Confession (#2) in substance stated:

On the morning of August 5, 1960, Richard Henry Dare (who was living with a sister at 15 S.E. 21st Street, Oklahoma city,) called up his estranged wife, Patricia Ann Dare, at about 10:00 o'clock. That she told Dare that she would pay him some money she owed him if he would come over to her father's (Ted Albert's) house, where she was living. Dare borrowed his sister's car and drove to the house around 11 or 12 o'clock. He and his wife talked for a while in the kitchen about living together again; but that in the living room they had gotten into an argument over money, and that he had hit her "up beside the head" with a water tumbler. She started screaming and he choked her with his hands. Dare then dragged her, still alive, but unconscious, into the bedroom and covered her with a sheet, and to prevent her from "hollering" he tied a cord around her neck. He then left the house, drove to another sister's and borrowed a gun to go hunting. Dare returned to the Albert residence, "tidied up the rooms", then sat down in the living room and waited for his mother-in-law, Virgie Albert, to come home, so "I could tell her". When Mrs. Albert heard of her daughter's death she, according to accused, began screaming and "clawing" at him, and he choked her, dragged her body into the bedroom and placed a cord around her neck. At this time, William McCormick, a nephew of his wife's, drove up and Dare hid behind the divan in the living room. The boy entered the house, started to open the door where the bodies had been placed, and Dare shot him in the right temple with a .22 caliber rifle. Dare dragged him into the bedroom and when he "kept trying to get up", tied a cord around his throat. Dare then removed the boy's trousers (because "I had blood on mine") and put them on. Two hours later, at approximately 7:30 Ted Albert returned to the premises. Dare stood behind the divan, shot him once in the temple after Albert had closed the front door. He took all the money he could find from the bodies and the house of the deceased and the keys to the two automobiles belonging to the family. Defendant left the scene, drove his sister's car home, brought some clothes; caught a cab and "went out drinkin". Around 10:00 P.M. he went back to Ted Albert's house and picked up his (Albert's) 1954 Oldsmobile. Before leaving Oklahoma City, Defendant stopped by for a girl, whom he had met earlier in the evening at a tavern, and the couple spent the next two days in the vicinity of Ardmore and Purcell, Oklahoma. On Sunday morning, the accused heard of the manhunt, then in progress, on a news cast over the car radio. He then proceeded to his sister's house (located in McClain County), first, concealing the automobile a little ways from her house and calling his brother-in-law to come after him. His sister drove Dare's companion to Blanchard to catch a bus back to Oklahoma City and Dare, armed with a .38 caliber pistol, hid in the surrounding countryside.

On the trial the court overruled the objection of defendant to the admission of the above summarized confession on the following authorities: Roulston v. State, Okl. Cr., 307 P.2d 861, 867; Holman v. State, 97 Okl.Cr. 279, 262 P.2d 456; Steen v. State, 82 Okl.Cr. 141, 167 P.2d 375; Miller v. State, 9 Okl.Cr. 255, 131 P. 717, L.R.A. 1915A 1088; State v. King, 111 Kan. 140, 206 P. 883, 22 A.L.R. 1006; State v. Bailey, 233 La. 40, 96 So.2d 34, 69 A.L.R.2d 340;

People v. Northcott, 209 Cal. 639, 289 P. 634, 70 A.L.R. 806; Haley v. State, 84 Tex.Cr.R. 629, 209 S.W. 675, 3 A.L.R. 779; State v. Roy, 40 N.M. 397, 60 P.2d 646, 110 A.L.R. 1.

We are of the opinion that the trial court did not err when overruling the objection of the defendant to admission of the Second Confession. While it is true that evidence of other crimes separate and distinct from the one charged are inadmissible into evidence, it is likewise true that there are certain well-established exceptions to this rule. This Court in Roulston v. State, supra (Later followed in Cody v. State, Okl.Cr., 361 P.2d 307, Syl. 15) stated the rule to which we adhere in this jurisdiction:

"Evidence of separate and similar offenses is admissible when it is material and proper to show (1) Motive, (2) Intent, (3) Absence of mistake or accident, (4) Identity of the person charged with the commission of the crime for which an accused is put on trial, and (5) Common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other."

We believe the rule as above set forth is clearly applicable in the case at bar; for assuming that the slaying of Patricia Ann Dare, defendant's wife, was unintentional, the other slayings were directly connected with the concealment of the first, and as it was summarized in his response to the question (propounded by Mr. Cunningham) in Dare's Statement #2, "And after that, (the murder of his wife), I don't know, just—I just thought well if I got them all while I was at it, well, it would be about three days before they'd be lookin' for me". (CM 146–147)

Under this same assignment of error, defendant asserts that the trial court erred in admitting Confession #3, pertaining only to the murder of Ted Albert, over the objection of defendant.

In this Confession, Dare stated that he was sitting on the divan waiting for Albert to appear, and after watching him park his car, he got behind the divan, shooting Albert, once in the right temple just after he had closed the door. Dare took the deceased "by the feet and drug him in the hall and took his billfold out and took about $30.00 off of him". Dare then took the car keys and left. Afterward, buying some clothes, changing into them at his sister's house, and returning about ten o'clock that night to get Albert's car. The accused picked up a woman in a tavern in Oklahoma City, and surrendered in McClain County two days later.

Defendant contends that the introduction of this recording (Confession #3) "could not add to the jury's information; it was merely repetitious and cumulative and therefore prejudicial." The trial court overruled this objection, granting an exception, citing as he did so, Lyons v. State, 77 Okl.Cr. 197, 138 P.2d 142; 140 P.2d 248 and 20 Am.Jr. "Evidence" § 486, Pg. 424.

As to this contention, we need only observe as did the Arizona Supreme Court in Foster v. State, 37 Ariz. 281, 294 P. 268, where it was claimed that the lower court had erred in admitting evidence of a second confession of the grounds that the same was repetitious:

"We think, even though it was not shown that the confessions were voluntarily made, they should not on appeal be held erroneously admitted when no objection was interposed until after the principal facts [established in the first confession] in that connection had been told to the jury [In the Foster Case, supra, as in the instant case, the defendant interposed the defense of insanity. But in the Foster case, the defendant did not take the stand and testify in his own behalf.] * * * especially so in view of the use made of such confessions to establish the defendant's defense of insanity. We, of course, have no means of knowing what the [defendant's] defense would

have done had the prosecution not introduced evidence of the confessions, but that they lent color to the defense of insanity seems quite clear."

■ In the instant case, the defendant testified in substantial accord with the statements he had previously made to the officers which were contained in Confession #1, #2 and #3, and used these statements as a basis for the hypothetical question propounded to Doctor Charles E. Smith, defense psychiatrist.

Defendant cites no authorities why several confessions may not be introduced in evidence against an accused if such confessions are freely and voluntarily given. As stated in 20 Am.Jr. "Evidence" § 486, Pg. 424:

"In the event there are several confessions by the accused, each relating to the same subject matter, there is no objection to the admission of all of them into evidence, provided they are all voluntary."

To summarize our ruling on this assignment of error, we observe that from the record it appears the confessions of defendant were voluntarily made; that no objection was interposed until after the principal facts in that connection had been told the jury, and that the confession formed a basis for defendant's defense of insanity at the time of the crime. We are therefore of the opinion that the trial court did not err in admitting Confession #3.

It is next urged that the evidence was insufficient to support the verdict of the jury and in support of this contention, the defendant argues that when the testimony of Doctors Charles Smith and Jim Berhman [1]

---

1. Doctor Charles E. Smith, a physician engaged in the practice of psychiatry and neurology, testified on behalf of the defense, that he had examined Richard Henry Dare on March 16, 1961; that he was with him for approximately three and a half to four hours on that day and that this examination constituted the only contact with defendant he had had. Dr. Smith testified further that he had obtained data in a report from Dr. Jim Berhman, of Central State Hospital, where Dare had been a patient. Defendant's counsel related again the details of the four slayings whereupon, he asked Dr. Smith—"Assuming those circumstances to be substantially true and taking into account your observation of the defendant made during your psychiatric examination of this defendant, are you able to state in your professional opinion as a psychiatrist * * * your diagnosis? * * *

"A. The diagnosis is that of a personality trend disturbance, specifically an unstable personality. * * * This is a diagnosis of an individual who is extremely undependable when he is under periods of stress, that is he is an individual who is not able to control his emotions of guilt, anger, hostility and he is also very insecure, * * * he is also a very insecure individual, one who acts without good reason.

"Q. Doctor, are you able to state in your studied opinion after your study of this defendant considering the matters stated in the hypothetical question which I asked you, whether on August 5, 1960 this defendant was sane or insane?

"A. It is my opinion he was insane at the time of killing these people.

\* \* \* \* \*

"Q. Are you able to perform a professional opinion, Doctor, with respect to whether the acts of striking his wife with a water glass, under the circumstances as stated in this assumed hypothetical question here, was a calculated or premediated act.

"A. No, sir, it was not, I feel like it was an impulsive act.

\* \* \* \* \*

"Q. Doctor from your study of this defendant, is it your opinion that at this time he has sufficient mental capacity to understand and know the purpose of these legal proceedings that he is involved in?

"A. Yes sir, he does.

"Q. Do you believe that this defendant has enough mental capacity and rationality about him to help a lawyer in the defense of this case?

"A. Yes sir, I do."

On cross-examination Dr. Smith testified that the defendant was competent to know right from wrong at "the present time" and that he had recovered this capability after "the acts of killings were completed". He further testified that Dare, in his opinion, had become insane

(psychiatrist on the staff of Griffin Memorial Hospital, Norman) was introduced on behalf of defendant a reasonable doubt as to the sanity of the accused was raised and it became incumbent for the state to introduce expert testimony establishing the defendant's sanity beyond a reasonable doubt.

■■ This assertion presumes that the jury was bound to give credence to the opinions of Doctors Smith and Berhman. This presumption is not the law of this jurisdiction, for we have held:

(1) "The testimony of experts is not conclusive on the issue of mental capacity since the law makes no distinction in weighing evidence between expert testimony and evidence of other character" (In re Smith, Okl.Cr., 326 P.2d 835);

and

(2) "On murder prosecution, the question of insanity at the time of the commission of the crime,

and "in a fit of rage * * * when he struck the first blow" and he had become sane "when he fired the last shot".

To corroborate the defense of insanity, the defendant called Dr. James M. Berhman to the stand. Dr. Berhman testified that he had become acquainted with Richard Henry Dare at the Oklahoma Central State Hospital, where Dare had been sent for examination. He testified that Dare was brought to the hospital for study and evaluation in October and remained through December 31, 1960, and that while there "no psychological tests, per se" were given the defendant. Asked for his diagnosis of Dare's mental condition on August 5, 1960, Dr. Berhman testified:

"I think he had personality problems. We usually refer to them in these days as personality disorders, might be best pinned down as a personality disorder * * * We usually like to further describe the personality disorder by the principal features of that person's personality by saying that perhaps Mr. Dare was insecure in his relationship with people, overly dependent in certain ways, at times demanding, he had a great deal of difficulty in communicating his interests and feelings to other people and as a result of these incidents in his life he has had a lot of inner resentment."

presents a question of fact for the sole determination of the jury, and where there is any evidence tending to support the finding it is not the province of the appellate court to weigh the same." (Tarter v. State, 359 P. 2d 596).

■ We have carefully examined the record and are of the opinion that the evidence, although conflicting, on this crucial issue was sufficient to support the verdict of the jury.

It is next contended that the court erred in giving instruction #8 (criminal responsibility on a plea of insanity), and that the test for insanity in this jurisdiction should be in accordance with defendant's requested instruction #1. Instruction #8, as given by the trial court, provided:

"You are instructed that an insane person is not responsible criminally for his acts committed when such mental condition existed. The test of criminal re-

"Q. (Defense) In your opinion, Doctor, do you believe the four acts of killing that are stated in the hypothetical question here have any relationship or form any pattern insofar as this defendant is concerned?

"A. It indicates he would lose his temper pretty completely at long intervals but this was not an uncommon thing as I understand the story, as I understand from his early life. * * * perhaps the crime was the most powerful episode he had ever been through but I think it fits in with a series of that kind of thing where he would hold a lot of anger for a long time and blow up."

Dr. Berhman further testified that the "emotional seizure" would have lasted through the series of murders, and that such emotional reactions might be termed in a small child a temper tantrum. The witness testified as to the defendant's mental capacity to understand the nature and purpose of the legal proceedings—"I don't think there is anything wrong with his memory as to incidents, but it is like you would say people with organic brain damage, that he would look at things quite differently than we would by reason of his emotional outlook * * *."

sponsibility for acts, which would ordinarily be criminal under the law, is:

"The mental ability or capacity to distinguish between right and wrong as applied to the particular act, and to understand the nature and probable consequences of such act, that is to say, the capacity to know right from wrong, and to know then that the particular act, alleged to have been committed, was wrong."

■ The court in giving this instruction relied upon Revard v. State, Okl.Cr., 332 P.2d 967, wherein this Court approved an instruction couched in identical language. This instruction, commonly referred to as the M'Naghten Rules,[2] has been the test used in determining criminal responsibility of an accused in every decision[3] rendered by this Court with the exception of Adair v. State, 6 Okl.Cr. 284, 118 P. 416, 44 L.R.A.,N.S., 119 and Claycomb v. State, 22 Okl.Cr. 315, 211 P. 429, wherein the Court instructed on "irresistible impulse". The doctrine of "irresistible impulse" was emphatically repudiated in Tittle v. State, 44 Okl.Cr. 287, 280 P. 865, and is not the rule followed in the State of Oklahoma.[4]

The defendant urges that the proper rule or test for criminal responsibility that should be adopted by this Court and applied in the instant case, and in all future cases, was contained in defendant's requested instruction #1, which reads as follows:

"If you the jury believe beyond a reasonable doubt that the defendant was not suffering from a diseased or defective mental condition at the time he committed the criminal act charged, you may find him guilty, if the evidence so warrants. If you believe he was suffering from a diseased or defective mental condition when he committed the act, but believe beyond a reasonable doubt that the act was not the product of such mental defect, you may find him guilty, if the evidence so warrants. Unless you believe beyond a reasonable doubt either that he was not suffering from a diseased or defective mental condition, or that the act was not the product of such mental defect, you may not find the defendant not guilty by reason of insanity. Thus your task would not be completed upon finding if you did find, that the defendant suffered from a mental disease or defect. He would still be responsible for his own unlawful act if there was no causal connection between such mental defect and the act with which he is charged. But on the other hand, unless you believe from all the evidence beyond a reasonable doubt that defendant's unlawful act was not the product of his mental defect, then it would be your duty to acquit him."

This instruction is in substantial accord with that given in Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.

**2.** 10 Clark & Finn. 200. The M'Naghten Rules evolved from the M'Naghten Case, wherein the defendant, one Daniel M'Naghten, was tried for the murder of Sir Robert Peel's private secretary. The defendant was laboring under an insane delusion that he was being hounded by his enemies and that Peel was one of them. The defense made was insanity, and the jury found him "not guilty, on the ground of insanity". Accordingly five questions were put to the fifteen judges of England regarding the law of insanity, and from their answers the "right-wrong rules", or M'Naghten Rules, are constituted.

**3.** Maas v. Territory, 10 Okl. 714, 63 P. 960, 53 L.R.A. 814; Turner v. Territory, 15 Okl. 557, 82 P. 650; Alberty v. State, 10 Okl.Cr. 616, 140 P. 1025, 52 L.R.A.,N.S., 248; Smith v. State, 12 Okl. Cr. 307, 155 P. 699; Owen v. State, 13 Okl.Cr. 195, 163 P. 548; Roe v. State, 17 Okl.Cr. 587, 191 P. 1048; Tittle v. State, 44 Okl.Cr. 287, 280 P. 865; Kennamer v. State, 59 Okl.Cr. 146, 57 P.2d 646; Merrick v. State, 56 Okl. Cr. 88, 34 P.2d 281; Gallagher v. State, 81 Okl.Cr. 15, 159 P.2d 562; Berryman v. State, Okl.Cr., 283 P.2d 558.

**4.** The most recent case in which the M'Naghten test was retained is Doggett v. State, Okl.Cr., 371 P.2d 523.

L.R.2d 1430 [5], and follows a charge to the jury given by the New Hampshire Court in 1870 [6].

No sooner was the ink dry on the Durham opinion than it was subject to criticism and rejection too numerous to incorporate in this opinion, but typified by that expressed in the case of Andersen v. United States [7], wherein Justice Lemmon observed:

"This Court has no desire to join the courts of New Hampshire and the District of Columbia in their 'magnificent isolation' of the rebellion against M'Naghten, even though New Hampshire has been traveling down that lonesome road since 1870. See State v. Pike, 49 N.H. 399. Rather than stumble along with Pike, we prefer to trudge along the now well-traveled Pike blazed more than a century ago by M'Naghten.

"We are fortified in this choice by the thought that the Supreme Court also has steadfastly journeyed with M'Naghten."

Further criticism of the Product Rule was echoed by Doctor Fredric Wertham, noted psychiatrist who stated [8]:

"As a legal test this new definition is insufficient: it gives undemocratic leeway to the partisan and/or bureaucratic expert, and, on account of its wording, lends itself to grave abuse. It does not guide the jury as to the degree of mental disease, a term which includes both psychosis and neurosis."

We are in accord with the view expressed by Judge Learned Hand that [the Durham Test] "did not seem to me to give us any guidance that perceptibly would help".[9]

We have carefully reviewed all of the authorities (both scientific and legal) and are unwilling, at this time, to abandon the rule so well-established in this jurisdiction, having found nothing better that would justify a change.[10]

██ The M'Naghten Rules, as a test for criminal responsibility, will remain the law in this jurisdiction until the Court of Criminal Appeals can conscientiously adopt rules, taking into consideration advances both legal and medical and the statutes of Oklahoma relating to criminal responsibility [11], which will better serve the orderly administration of criminal justice.

In passing, we observe and concur with the well-established principle that the line is clearly drawn between law and medicine on the matter of criminal responsibility,

5. The Durham Test (commonly referred to as the "product Rule") was subsequently enlarged by the District of Columbia in United States v. Currens (3 Cir., 290 F.2d 751) and favorable comment may be found in Carter v. United States, 102 U.S.App.D.C. 227, 252 F.2d 608. It should be noted that since the annunciation of the Durham Rule in 1955, it has been followed only by the territorial courts of the Virgin Islands.

6. Pronounced in State v. Pike, 49 N.H. 399, 6 Am.Rep. 533 and followed by State v. Jones, 50 N.H. 369, 9 Am.Rep. 242.

7. 237 F.2d 118, 127 (9th Cir. 1956).

8. Wertham, Psychoauthoritarianism and the Law, 22 U. of Chi.L.Rev. 336, 337. (1955)

9. 22 U. of Chi.L.Rev. 319 (1955).

10. Thirty states adhere to the right-wrong test as the sole determinant of criminal incapacity based on mental disorder.

Arizona, California, Florida, Idaho, Illinois, Iowa, Kansas, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, Nevada, New Jersey, New York, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, South Dakota, Tennessee, Texas, Washington, West Virginia, Wisconsin, Hawaii and probably Rhode Island. (Note: In Maine and West Virginia the test apparently is interpreted to require a certain capacity for control as well as cognition.)

11. Title 21 O.S. § 152 (Subdivision 4) provides that the following persons are incapable of committing a crime: (a) lunatics (b) insane persons (c) all persons of unsound mind, including temporarily or partially deprived of reason, upon proof that at the time of committing the act charged against them they were incapable of knowing its wrongfulness.

when the plea of insanity is interposed as a defense. The delineation between these two fields of empirical science is best expressed in the words of Stephens [12]:

"The question, 'what are the mental elements of responsibility?' is, and must be, a legal question. It cannot be anything else, for the meaning of responsibility is liability to punishment; and if criminal law does not determine who are to be punished under given circumstances, it determines nothing.

" * * * it is the province of medical men to state for the information of the court such facts as experience has taught them bearing upon the question whether any given form of madness affects, and in what manner and to what extent it affects, * * * (there is) * * * no reason why, under the law as it stands, this division of labour should not be fully carried out."

We are therefore of the opinion that the trial court did not err in giving instruction #8 and in refusing to give defendant's requested instruction #1.

In a separate brief filed by Mr. Maurice Nagle, it is urged that although not requested by the defendant, the trial court erred in failing to instruct the jury upon the included offense of Manslaughter in the First Degree, which is defined under Title 21 O.S.A. § 711, the pertinent part being:

"Homicide is manslaughter in the first degree * * *

"(2) When perpetrated without a design to effect death and in a heat of passion, but in a cruel and unusual manner, or by means of a dangerous weapon; unless it is committed under such circumstances as constitute excusable or justifiable homicide."

We have long followed the rule:

"Only questions which are raised in trial court and an adverse ruling had thereon, and exception taken thereto,

and then incorporated in motion for new trial and assigned as error in petition in error, will be considered on appeal." Brannon v. State, 94 Okl.Cr. 261, 234 P.2d 934.

The language used in Foster v. State, Supra, is particularly applicable here:

"We can see no reason for submitting the issue of second degree murder or manslaughter to the jury when the evidence conclusively shows defendant guilty of the highest degree of the crime or not guilty at all by reason of his insanity. There is no middle ground in such case, no evidence tending to show the lower degree of murder or manslaughter."

We are of the opinion that under the facts presented in the instant case no issue of Manslaughter in the First Degree was presented, and that it was not error for the court to fail to instruct the jury upon Manslaughter in the First Degree.

It is next contended that the trial court erred when in the defendant's closing argument the court refused to allow counsel for defense to read the position of certain religious denominations to the jury. From the case made the following appears: (CM 316)

"Mr. Anderson: A moral question is involved here which touches into some aspects of a religious question. Most of us look to the churches to provide some of our religious and moral leadership. I would like to read to you from the official discipline of the Methodist Church, the position of the Methodist Church on Capital Punishment.

"Mr. Mounger: I object to that.

12. See Stephen, History of the Criminal Law of England, Vol. II, pg. 183.

"The Court: As the law, the jury has been told that they are to be guided by the evidence and testimony the law given to them in this court room while Court is in session. That is the last instruction.

"Mr. Anderson: Ladies and Gentlement of the Jury, I am sorry that the State does not want you to hear the—

"The Court: That remark is stricken. The Jury is instructed to disregard it. It is not the law.

"Mr. Anderson: Exception.

"The Court: Allowed."

The trial court properly excluded this argument and properly prohibited the reading of these religious statements to the jury, under the theory that the same had not been offered into evidence.

The punishment to be imposed for criminal offenses is secular and is prescribed by the legislative bodies of this State. It is the duty of the jury to follow the law enacted by the Legislature, as interpreted by the courts in instructions to the jury. It is to the Legislature, rather than to the jury, that these moral and religious concepts must be directed, for the authority to abolish capital punishment is vested in that body.

The last assignment of error is predicated on the closing statements of the county attorney to which no exception was interposed, nor did the defendant request that the court admonish the jury to disregard it. The entire excerpt as contained in the casemade (Page 321-A) reads:

"By Mr. Mounger:

"Now, the question, there is only one question in the lawsuit ladies and gentlemen, and that is this: the punishment. Counsel talked about rehabilitation, talked about the history of punishment, they had punishment long before you and (I) were born, they'll have it long after we're gone, we know that. Like war and peace, they talk about peace, but wars come along, they do everything they can but still wars come along. Talk about the electric chair and penalty, when the President of the United States issues the Order and Congress confirms it for war, he's not singling out people to be shot with a rifle, that's not his plans, he's writing an order for principle upon which you and (I) stand, and when you write this verdict and find this man guilty and fix that punishment at death in the electric chair, you'll be building the fibers of law in the State of Oklahoma, when you commit murder. That's the law that is given to you by Judge Mills.

"You've been here a long time and I know that it's rather tiresome sitting in those chairs. I appreciate your kindness. I sincerely hope for every citizen in this State and there are many many of them, doing the right things, I certainly hope you write the verdict and fix this man's punishment where it belongs, death in the electric chair. Write the verdict for Judge Mills. You write that verdict and the State of Oklahoma will do away with this type of citizen—where he actually belongs and don't worry about it.

"He's talked about the life, the law is as old as he represented: 'Thou Shalt not Kill, Thou Shalt not Kill, An eye for an eye and a tooth for a tooth.' Write the verdict, ladies and gentlemen, it shouldn't take too long to do it. There may be some man or woman on this jury that will say 'oh well, it won't hurt to give him a life sentence, easy on Pa'. We told you that the County Attorney believes in Capital punishment but what I forgot to say was I believe there is somebody else too, ladies and gentlemen, and when you do you don't have anything to apologize to anybody

for, any Church you go to, any society, anywhere, you don't have anything to apologize for anymore than we do for bringing the evidence to you."

■ From the above cited, the only excerpt preserved on record for this Court, we are inclined to believe that the remarks of which defendant now complains could easily have been invited by counsel for defendant, i. e., the reference, *"He's* talked about the life, the law is old as *he* represented" indicates such possibility. However, the record is silent as to the complete closing remarks of either the defendant or the county attorney, and therefore, we follow the rule set forth in Grimes v. State, Okl.Cr., 365 P.2d 739:

"Ordinarily error cannot be predicated upon mere unexplained excerpts from the remarks of counsel to the jury. Enough must appear of record to advise the appellate court of what preceded the alleged objectionable remarks and their meaning to be deduced from the context, and whether or not they were invited or provoked by remarks made by opposing counsel."

Applying this rule in the instant case, we are of the opinion that this assignment of error is without merit.

### CONCLUSION

We wish to acknowledge and commend the Public Defender, Mr. Don Anderson, who so diligently and ably represented his client in these proceedings, and for his excellent briefs on appeal. We wish also to give recognition to the Honorable Clarence Mills, before whom this case was tried and whose trial memorandum contained within the case made, setting forth the authorities upon which the court based its ruling in the reception and rejection of evidence was of immeasurable assistance to this court in passing on the issues raised on appeal.

■ After a careful and detailed examination of the case made, the briefs of counsel for defendant, and an extensive study of authorities relating to each contention raised on appeal by defendant, we find no reason or error of law sufficient to justify reversal. Therefore, the judgment and sentence rendered herein is accordingly affirmed.

The date originally appointed for the execution of the defendant Richard Henry Dare having passed pending this appeal, it is ordered, adjudged and decreed by this Court that the judgment and sentence of the District Court of Oklahoma County be carried out by the electrocution of the defendant Richard Henry Dare by the Warden of the State Penitentiary at McAlester, Oklahoma, on Tuesday, April 2, 1963.

NIX, P. J., and BRETT, J., concur.