643 P.2d 8

The STATE of Arizona, Appellee,

v.

Bo M. W. BURRIS, Appellant.

No. 2 CA–CR 2416–2.

Court of Appeals of Arizona,
Division 2.

Feb. 1, 1982.

Rehearing Denied March 10, 1982.

Review Denied March 30, 1982.

564

Robert K. Corbin, Atty. Gen. by William J. Schafer, III, and Jack Roberts, Asst. Attys. Gen., Phoenix, for appellee.

Thomas E. Higgins, Jr., Tucson, for appellant.

## OPINION

HOWARD, Chief Judge.

Appellant was found guilty by a jury of unlawful imprisonment and aggravated assault, a dangerous non-repetitive offense. He was sentenced to concurrent prison sentences of six months and five years, respectively. He contends the trial court erred (1) in refusing to allow him to cross-examine the victim as to certain matters which would show the victim's bias, prejudice and motives; (2) in refusing to suppress the evidence of the crime, and (3) in failing to properly qualify the interpreter or to allow him to substitute his own interpreter. He also attacks the grand jury proceedings. We affirm.

The victim, Manuel Hernandez Garcia, illegally entered the United States on August 21, 1980, with another alien who knew appellant. They went to appellant's ranch and appellant gave Garcia a job doing general cleanup work and looking after his two small daughters.

On October 3, 1980, Garcia was alone at the ranch when Newell Casavant arrived. Appellant allegedly owed Casavant money for some electrical work he had done at the ranch. Casavant asked Garcia, who spoke almost no English, if appellant had left some money for him. When Garcia said that he didn't, Casavant began to look around the premises. Casavant eventually departed but returned later that night with a person named Sidney Belt. Garcia heard heavy objects being moved but was afraid

to go outside and investigate. Belt and Casavant took appellant's tools as "security" for the alleged debt. The next morning Garcia discovered the tools were missing and saw tire tracks that matched those of Casavant's truck.

Garcia was alone at the ranch until noon on October 6 when Willis Flint, an artist, arrived to work on a mural he was painting in appellant's home. Since Flint spoke Spanish, Garcia told him what had happened. They tried to locate appellant but were unable to do so. When appellant returned to the ranch at about 8 p. m., Garcia told him what had happened, showed him the tire tracks, and told him that he thought Casavant had taken the tools. Appellant did not believe Garcia and thought that he had taken the tools himself and hid them in the desert. Appellant wanted to go to Tucson to confront Casavant and Garcia wanted to see the police. Appellant did not want to take Garcia to the police, but Garcia agreed to accompany appellant to Tucson to confront Casavant. Appellant took his shotgun with him in the truck and they both left for Tucson. Appellant could not locate Casavant and stopped at the home of Sidney Belt. He left Garcia and his shotgun with Belt while he went to a nearby Circle K to get gas. Appellant then came back to Belt's residence, got Garcia, and they went back to appellant's ranch.

Upon arriving at the ranch, appellant had Garcia remove a large chain from the truck and told him to get a blanket out of the bunkhouse so Garcia could sleep outside. Garcia told appellant that he was a man, not an animal to be threatened with a shotgun, and that it was cold outside. Appellant pointed the shotgun at Garcia as Garcia walked towards the bunkhouse. When Garcia neared the door of the bunkhouse, appellant pushed him into the doorway and Garcia pushed back. Garcia then began walking away from the doorway towards Flint's truck. With a distance of about 7 feet between them, appellant fired a shot near Garcia's feet and then aimed the shotgun at his chest and kept it aimed there until Garcia entered the bunkhouse.

The argument and noise had awakened Flint, who was sleeping in the back of his truck. He told Garcia to let appellant do what he wanted to so that they all could go to sleep. Appellant then placed the chain around Garcia's neck and padlocked it. He then padlocked one end of the chain around a tree outside the bunkhouse and another part around the toilet in the bunkhouse. The time when the chaining took place was approximately 10 p. m. on October 6.

The next morning appellant told Garcia that he was going to Tucson, but said nothing about reporting the burglary to the police. About 5 p. m. Casavant arrived and told Flint that he heard that appellant had come looking for him with a shotgun. When appellant returned that night, Casavant was still there. After talking with Casavant, appellant removed the chain from Garcia's neck but told him that Casavant would kill him if he tried to leave. Appellant, at that time, conceded that Garcia was not guilty of the burglary and told him that he could stay on. Garcia told appellant that he wanted to be paid so that he could go back to Mexico.

Meanwhile, at about 8:15 in the evening, an anonymous caller informed a United States Border Patrol agent, Gregory Reed, that an illegal alien was chained by the neck to a tree at a ranch near mile post 50 on U. S. Highway 83, the Sonoita highway. The caller knew the rancher's name but would not reveal it. Reed relayed this information to the Pima County Sheriff's Office.

About 10:30 p. m., Deputy Gary Force was dispatched to locate the ranch Reed had described and investigate the matter. Having initially encountered difficulties with the directions given to him, Force finally located appellant's ranch with the help of a Mr. Thayer, appellant's neighbor. When Force pulled into appellant's property in a marked patrol car and informed him of the reason for his visit, appellant told Force that he was wasting his time and that nobody was chained there. This was literally true since a couple of hours earlier appellant had released Garcia after determining that he did not commit the burglary.

As Force and Thayer were about to leave the ranch, Thayer called Force's attention to a large chain around the trunk of a tree near the bunkhouse. When Force asked appellant about the chain, appellant replied that he was going to mention that to Force and in answer to Force's request to see what was on the other end of the chain which led into the bunkhouse, appellant told him, "wait here". After appellant did not immediately return, Force walked around to a window on the outside of the building and looked in. He could see the chain leading through the small rooms of the bunkhouse, but could not see the end of it. Moving to another window, he observed appellant getting up from his knees in the bathroom and moving towards the front of the bunkhouse. Unbeknownst to Force, appellant had gone into the bunkhouse, gotten hold of Garcia and pushed him into a closet.

When appellant returned, Force asked him again if he could see the other end of the chain. Appellant told him that he could. Force followed the chain to a small bathroom and found the other end wrapped around the base of the toilet. Approximately six feet from the toilet in the same room was a closet door. Force opened the door and found Garcia standing in the closet with his back to the door. From speaking to appellant and afterwards utilizing Mr. Thayer as an interpreter, Force ascertained that Garcia was probably an illegal alien, took him into custody and handcuffed him.

Based on the information from Deputy Force and statements from Garcia which were given to sheriff's deputies after he left the ranch, a search warrant was issued and executed. Sheriff's deputies seized the chain, two expended shotgun shells, a twelve-gauge shotgun and other items found on the property.

Appellant testified at the trial on his own behalf. He admitted chaining Garcia, admitted that he never had any intention of calling the police even though he suspected that Garcia had committed a burglary, admitted that he intentionally fired the shotgun but stated that he did so out of frustra-

tion and never in an attempt to threaten Garcia. He also denied that he ever pointed a shotgun at Garcia in a threatening manner and denied that he discharged the shotgun near Garcia's feet. Thus it is clear that when the case went to the jury there were only three factual disputes: (1) What was appellant's intention when he discharged the shotgun? (2) Did appellant point the shotgun at Garcia in a threatening manner? (3) Did appellant discharge the weapon at or near Garcia's feet?

## LIMITATION ON IMPEACHMENT EVIDENCE

Appellant contends the trial court erred when it refused to allow him to put on the testimony of Don Estes, Esq., as to the preparation of a civil lawsuit for damages arising out of appellant's conduct which formed the basis for the criminal prosecution. In the offer of proof, Estes testified that another attorney contacted him and told him that the Mexican consulate wanted some United States lawyers to contact Garcia and advise him of his legal rights. Estes and the other lawyer met with the consul and Garcia. The lawyers told Garcia about the various legal claims he might have against appellant, and Garcia asked the lawyers to see if there was something they could do for him. Garcia signed a retainer agreement.

Estes discussed the possible lawsuit with a deputy county attorney who said she did not want him to file a lawsuit at that time. Estes made out a rough draft of a complaint but as of the time of the trial nothing further had taken place and the matter was "up in the air".

Appellant offered this testimony in order to impeach Garcia's testimony by showing his bias, prejudice and motive. When questioned about the relevancy of this testimony, appellant's counsel said that it showed a motive to lie. The trial court told appellant's counsel that he would consider the offer of proof if appellant could point out to him evidence which would show that Garcia had changed his account of the incident after he had been contacted by Estes and signed the retainer agreement. Without such evidence the trial court was of the

opinion that the offered testimony did not show a motive to lie. Such foundational evidence was never forthcoming, and the trial court rejected the offer of proof.

■ The fact that a witness has instituted a civil action against the defendant based upon the same transaction charged in the information or indictment has a direct bearing on the credibility of the witness to show bias and prejudice, as well as the witness' relationship to the case. The refusal to allow a defendant to cross-examine a witness concerning such a civil action has been held to be prejudicial error. *State v. Ornelas*, 15 Ariz.App. 580, 490 P.2d 25 (1971); *State v. McMurtry*, 10 Ariz.App. 344, 458 P.2d 964 (1969). In *State v. Taylor*, 9 Ariz.App. 290, 451 P.2d 648 (1969), the defendant complained that he was not permitted to cross-examine the mother of the complaining witness as to whether a civil action was being filed against the defendant arising out of the shooting of her son by the defendant. We held that the testimony was within the permissible limits of cross-examination to show bias or a motive to show bias or a motive for lying on the part of the witness.

■ We believe the proffered testimony was admissible. We do not, however, believe that the court committed reversible error by rejecting it. The motive and interest of Garcia in the criminal prosecution is quite clear without the rejected testimony. He was chained up and shot at by appellant. Cf., *Gonzales v. City of Tucson*, 124 Ariz. 450, 604 P.2d 1161 (App.1979). As far as it shows a motive for lying, it would only do so if it could be shown that Garcia changed his story after being contacted by Estes. The record discloses that his material testimony was the same as what he told the sheriff. We conclude that any error in rejecting this testimony was harmless beyond a reasonable doubt.

■ Appellant's tactics during the state's case in chief were to attempt to discredit every witness who testified and make it appear as if they were not telling the truth. When the trial court denied his motion for a directed judgment of acquittal, appellant testified and, as we have previously stated,

admitted the chaining and the intentional discharging of a shotgun. During the state's case in chief, appellant also wanted to cross-examine Garcia about his relationship with the immigration service, his theory being that Garcia was told he wouldn't be deported if he testified against appellant and that this, like the evidence about the proposed civil suit, showed his bias, interest, prejudice and motive to lie.

Appellant's offer of proof which was rejected by the trial court was as follows:

"Q. [By defense counsel] Did anyone tell you you could stay as long as you wanted in the United States?

A. [By Mr. Garcia] No.

Q. Did Immigration say they were sending you back to Mexico?

A. If I didn't—if I didn't sue Burris, yes.

Q. That they were going to send you back to Mexico?

A. Yes, they were going to send me to El Centro, California.

Q. Who told you you'd have to sue Burris?

A. They tell me that if .. Immigration told me if I didn't sue him they were going to send me to Mexico.

Q. Who at Immigration told you that?

A. Everybody in Immigration.

Q. Who is going to sue Mr. Burris?

A. Immigration told me that what Burris did to me about tieing me up was not a good thing for him to have done to me.

Q. And that you should sue him?

A. No, that Immigration told me that he told me that what Burris had done to me that I could accuse him before the police or before the court—. . . ."

Assuming arguendo that the court erred in rejecting the offer of proof, we find the error to be harmless beyond a reasonable doubt for the same reasons which we stated in connection with the contemplated civil suit.

## THE SEARCH AND SEIZURE

Appellant contends the trial court erred in admitting the evidence acquired pursuant to the search warrant because it was

tainted by an initial search and seizure without probable cause. We do not agree.

The evidence at the motion to suppress shows that appellant consented to Deputy Force's entry into the bunkhouse to see what was at the end of the chain. Appellant contends, however, that he did not give Deputy Force consent to conduct a general search of the bunkhouse and did not give him consent to open the closet door. He therefore contends that the seizure of the victim by Deputy Force was illegal because of lack of probable cause or exigent circumstances and that any evidence discovered thereafter as a result of the victim's statements to the deputy sheriff was tainted and should have been suppressed as "fruit of the poisonous tree". See *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); and see Annot. 43 A.L.R.3d 385.

The exclusionary rule is applicable to live-witness evidence. *Wong Sun v. United States*, supra. However, it is not applicable in all circumstances where there has been illegal search. In *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978) the court set forth the factors which should be taken into consideration in deciding whether live-witness testimony should be admitted in the face of a Fourth Amendment challenge. However, we need not concern ourselves with these factors since we believe that there was probable cause.

■ Probable cause validates a warrantless search where there is information sufficient to justify belief by a reasonable man that an offense is being or has been committed. *State v. Heberly*, 120 Ariz. 541, 587 P.2d 260 (1978). If a tip in itself is insufficient, the officer may corroborate information by independent observation sufficient to rise to the level of probable cause. *State v. White*, 122 Ariz. 42, 592 P.2d 1308 (App.1979). Deputy Force observed a large chain around the tree near the bunkhouse. The chain went from the tree through the front door of the bunkhouse, an unusual position for a chain. When asked about the chain, appellant said he was going to tell Force about it but then told him to wait outside. Appellant did not ask Force to go

into the bunkhouse but instead went inside and was observed kneeling in the same room in which the chain was located. When Deputy Force went into the bunkhouse, he saw the chain wrapped around the toilet. We believe that a reasonable person could conclude that appellant did not want anyone to enter into the bunkhouse until he had done something inside the bunkhouse. From this, one could reasonably conclude that there was something to be hidden inside the room. From the position of the chain, the actions of appellant, and the information given that an illegal alien had been chained up on the premises, we believe that a reasonable person could conclude that the illegal alien was still somewhere inside the bunkhouse. The trial court did not err in denying the motion to suppress.

## THE INTERPRETER

Appellant asserts that the person who interpreted for the court, Donna Alcantara, was not properly qualified, that her qualifications were never placed in the record, and that his interpreter should have been allowed to give the jury alternative interpretations of allegedly crucial elements of the victim's testimony.

A.R.S. § 12–241 allows the trial court to appoint an interpreter when necessary. There are two rules of evidence which relate to the interpreter. Rule 604, Arizona Rules of Evidence, 17A A.R.S., provides: "An interpreter is subject to the provisions of these rules relating to qualification as an expert and the administration of an oath or affirmation that he will make a true translation."

■ Rule 702, Arizona Rules of Evidence, 17A A.R.S., relates to testimony by expert witnesses and states:

"If . . . specialized knowledge will assist the trier of fact to understand the evidence . . . a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto . . . ."

The competency of an interpreter should be determined prior to the time when he enters on the charge of his duties. *State v. Chyo Chiagk*, 92 Mo. 395, 4 S.W. 704 (1887).

The qualifications of an interpreter are subject to proper inquiry by the party against whom the evidence is going to be used. *Missouri, K. & T. Railway Company v. Bagley*, 60 Kan. 424, 56 P. 759 (1899). The interpreter's competency may be attacked by direct or cross-examination or by independent testimony. *Claycomb v. State*, 22 Okl.Cr. 315, 211 P. 429 (1923). In addition, the accuracy of the sworn interpreter's interpretation may be impeached and is ultimately to be determined by the jury. *Skaggs v. State*, 108 Ind. 53, 8 N.E. 695 (1886). However, whether a person is qualified as an interpreter is a matter resting within the discretion of the trial court. See, *Sam v. State*, 33 Ariz. 383, 265 P. 609 (1928).

We conclude that unless the parties stipulate as to the qualifications of an interpreter, a foundation should be laid before the jury as is done with any other expert witness, and the trial court should then rule on whether the person may or may not so act.

The record here shows that appellant wanted to voir dire the interpreter in front of the jury. The court did not allow him to do so, but did allow him to voir dire her in front of the court. The voir dire discloses that she was the "official" court interpreter for Pima County Superior Court and had been interpreting for the past three and one-half years.

Later during the trial, appellant moved to strike Mrs. Alcantara as an interpreter because he believed that she was not interpreting correctly. The trial court refused to do so. The trial court gave appellant an opportunity to cross-examine the interpreter in front of the jury about her misinterpretation, but appellant declined to do so.

Later in the case, the trial court permitted appellant's interpreter, Mr. Miller, to testify outside the presence of the jury. Mr. Miller testified that in his opinion, and after having observed the translation of Mrs. Alcantara, the interpretation done by her was adequate and she was not unqualified.

There was confusion in the trial by the failure to recognize that the position of the interpreter was no more than that of an expert witness. However, any error that may have been committed relative to the interpreter was harmless beyond a reasonable doubt. The burden was on appellant to show that the deficiencies of the interpreter denied him a fair trial. *Gallegos v. Garcia*, 14 Ariz.App. 85, 480 P.2d 1002 (1971). Appellant's own witness disproved that such deficiencies occurred.

## THE GRAND JURY PROCEEDINGS

Appellant makes certain attacks against the grand jury alleging that he was denied a substantial procedural right and that the grand jury was being misused by the prosecutor. We are unable to perceive any error, if there be any, since appellant was not indicted by a grand jury but was held to answer after a preliminary hearing by the superior court acting as a magistrate.

Affirmed.

HATHAWAY and BIRDSALL, JJ., concur.