918 P.2d 1056

**STATE of Arizona, Appellee,**

v.

**Edward Walter GERTZ, Appellant.**

**No. 1 CA–CR 93–0624.**

Court of Appeals of Arizona,
Division 1, Department A.

Nov. 28, 1995.

Reconsideration Denied March 8, 1996.

Review Denied June 19, 1996.

---

Grant Woods, Attorney General by Paul J. McMurdie, Chief Counsel, Criminal Appeals Section, and R. Wayne Ford, Assistant Attorney General, Phoenix, for Appellee.

Craig Mehrens, Phoenix, for Appellant.

## OPINION

FIDEL, Presiding Judge.

Edward Walter Gertz ("Defendant") appeals his convictions and sentences for sexual abuse, kidnapping, and fraudulently procuring the administration of a narcotic drug. For reasons that follow, we reverse and remand for a new trial.

## I.

In August 1991, Defendant was a cardiologist affiliated with St. Joseph's Hospital in Phoenix when JS, a 16–year–old boy, was admitted to the hospital with an abdominal

gunshot wound. Defendant consulted in JS's medical treatment, determined that JS had a heart murmur, and ordered a diagnostic echocardiogram.

A technician performed the echocardiogram on the afternoon of August 21, but could not complete it because the placement of a drain tube impeded a subcostal view of the heart. Witnesses dispute, however, whether a subcostal view was diagnostically required.

JS's drain tube was removed later that day; and around 9:00 p.m., Defendant came to JS's hospital room, stated he had come to take JS for his second echocardiogram, and suggested medication because the process might be painful. JS initially declined medication, but consented when Defendant persisted in his recommendation. Rita Mac-Knight, JS's nurse, administered Demerol at Defendant's direction. Though she offered to call transportation or help Defendant move JS from his room to the laboratory where the echocardiogram would be performed, Defendant declined help and wheeled JS from the room.

Demerol has a sedative effect, and JS drifted in and out of sleep. JS testified, however, that Defendant never performed the echocardiogram, but instead took him to a vacant examining room where JS awoke once to find Defendant kissing him on the mouth and awoke again to find Defendant fondling his penis.

Defendant and JS returned to JS's hospital room at approximately 10:00 p.m. Mac-Knight entered the room and found JS seated in his wheelchair with Defendant standing next to him. She described Defendant's demeanor as "anxious," his speech "rather fragmented," and his actions "quick" and "jittery." After Defendant left the room, JS told MacKnight that he had been kissed and fondled by Defendant. MacKnight informed her supervisor, who contacted the hospital security officer, who contacted the Phoenix Police Department.

Defendant maintained that JS's accusations were the product of delirium or falsehood. He was tried before a jury and convicted on one count each of sexual abuse, kidnapping, and fraudulent procurement of the administration of a narcotic drug. The trial court sentenced Defendant to an aggravated 2.5–year prison term for sexual abuse and imposed five years of probation for the other counts.

In a timely appeal, Defendant raises three issues, two of which we reach. He argues that the trial court erred by denying his motion to reopen to prove that JS had filed a civil damages suit against Defendant, and he argues that the trial court erred by permitting the State unlawfully to use his compelled, immunized testimony from a collateral administrative hearing. Because we find reversal warranted on both grounds, we need not reach Defendant's argument that the trial court considered improper factors in sentencing him to an aggravated prison term.

## II.

JS testified during the State's case-in-chief. On cross-examination, Defendant's attorney sought to establish that JS was planning to sue Defendant and St. Joseph's Hospital and that his testimony was tailored to serve that purpose:

Q: Let me get back to when I was asking you about this well-dressed gentleman in the gray suit here. That is Wendell Wilson, right?

A: Yes.

Q: He is your, one of your civil lawyers that you hired or your folks have hired, correct?

A: Yes.

Q: And that is in connection with filing some type, possibly, of a lawsuit in this matter, correct?

A: *Well, we haven't talked about filing a lawsuit or anything.*

Q: I see. And the other lawyer that was here earlier, Kevin Keenan is from another law firm; he is another possible civil lawyer for you?

A: Well, I met him.

(Emphasis added.) On redirect examination, the prosecutor asked JS when he first met Mr. Wilson, and JS answered that he met Wilson "[a] week after, a few days after

[being released from the hospital], I am not really sure."

In closing arguments the lawyers debated JS's motive to lie. The prosecutor stated:

[C]ertain questions were asked, *trying to infer that [JS] had some motive for coming in here and lying to you about what happened.*

*I would submit there's no evidence in this case of that,* and basically the reason is that [JS's] description of these events, which he gave on the night of August 21st to Rita MacKnight and John Kerr, ha[s] not changed one iota in the past year and a half.

Defendant's counsel responded:

[JS is] here today without his lawyer.

You recall that when I asked [JS] who that nicely-dressed gentleman was in the first row that he brought to court with him on two occasions [Wendell Wilson], that he said it was one of his civil lawyers that he and the family had hired. And then he identified Kevin Keenan as another possible civil lawyer who's been in the courtroom. And then he said, *We haven't talked about filing a lawsuit or anything. Is that credible?*

(Emphasis added.) Defendant's counsel reminded the jury that Wilson had been hired a week after JS left the hospital and that Wilson had given JS "a list of what happened that night to go over" before JS had testified on earlier occasions. He asked the jury to consider,

Now, why is Mr. Wilson, a civil attorney, giving [JS] a list of what happened if his story is, as [the prosecutor] would tell you, is so consistent? Why does he need to give him a list?

In rebuttal, the prosecutor returned to the point, stating:

1. JS gave his trial testimony on April 20, 1993. The Complaint is dated the "3rd day of May, 1993," but the word "May" is handwritten and inserted over the typed, crossed-out word "April."

2. Rule 608(b), Arizona Rules of Evidence (the "Rules"), states:
   Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of

The defense in this case has been boiled down to three things: Either [JS] was experiencing a short duration of being crazy and imagining what happened—if you do not accept that, that then he's lying about it because of alleged motive *of which there's no evidence,* that he wants to sue the defendant and recover some vast sum of money.

(Emphasis added.)

After closing arguments but before jury deliberations, outside the presence of the jury, a process server delivered a summons and complaint [1] to Defendant, naming him as a defendant in a civil damages suit brought by JS. Defendant sought to reopen for the limited purpose of testifying that JS had sued him and to offer the summons and complaint as evidence. The trial court denied the motion, and Defendant argues that the trial court erred.

■ We review this ruling for abuse of discretion. *State v. Taylor,* 112 Ariz. 68, 83, 537 P.2d 938, 953 (1975). The State characterizes evidence of the lawsuit as extrinsic impeachment evidence that the trial court correctly excluded as collateral to the issue of guilt.[2] If the proffered evidence indeed had no purpose other than impeachment by contradiction, we would uphold the trial court's ruling as consistent with Rule 608(b). *See State v. Hill,* 174 Ariz. 313, 325, 848 P.2d 1375, 1387 (1993) ("Evidence is collateral if it could not properly be offered for any purpose independent of the contradiction."); *Delozier v. Evans,* 158 Ariz. 490, 494–95, 763 P.2d 986, 990–91 (App.1988) (upholding exclusion of extrinsic evidence offered to impeach on collateral matter).

Defendant, however, did not offer evidence of the lawsuit merely to impeach JS's trial crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

testimony. Rather, Defendant sought affirmatively to prove that JS was motivated by financial interest in an impending civil damages suit.

An effort to impeach on a collateral matter differs significantly from an effort to affirmatively prove motive or bias. Rule 608(b) restricts the former; the sixth amendment protects the latter. The Supreme Court stated in *Davis v. Alaska* that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." 415 U.S. 308, 316–17, 94 S.Ct. 1105, 1110–11, 39 L.Ed.2d 347 (1974); *see also United States v. Gambler*, 662 F.2d 834, 837 (D.C.Cir.1981) ("[T]he trial court should allow cross-examination and the airing of evidence with respect to a witness's pending, or even contemplated, suit against the defendant."); *United States v. Stamper*, 766 F.Supp. 1396, 1400 (W.D.N.C.1991) ("[T]o confront the complainant effectively, to elucidate the facts and legal issues here in question fully, and to present a defense in a constitutionally viable trial, Defendant must be allowed to set before the jury the proffered evidence of ulterior motives of the complainant."), *aff'd*, 959 F.2d 231 (4th Cir.1992).

Arizona case law likewise recognizes that evidence of a civil action by a complaining witness against the defendant, arising from the same transaction that is the subject of the prosecution, has "a direct bearing on the credibility of the witness to show bias and prejudice, as well as the witness' relationship to the case." *State v. Burris*, 131 Ariz. 563, 567, 643 P.2d 8, 12 (App.1982); *accord State v. Salazar*, 146 Ariz. 547, 549–50, 707 P.2d 951, 953–54 (App.1985); *State v. McMurtry*, 10 Ariz.App. 344, 345, 458 P.2d 964, 965 (1969); *State v. Taylor*, 9 Ariz.App. 290, 294, 451 P.2d 648, 652 (1969).

The State argues alternatively that the excluded evidence, even if admissible to prove motive or bias, was cumulative and non-prejudicial "[b]ecause [Defendant] did introduce evidence of the possibility of a civil lawsuit," because he cross-examined JS freely concerning his relationship with the civil lawyers, and because he adequately "argued the bias and motive associated with this evidence." *See Burris*, 131 Ariz. at 567, 643 P.2d at 12, and *Salazar*, 146 Ariz. at 549–50, 707 P.2d at 953–54 (finding the exclusion of comparable evidence to be harmless error). These arguments might be persuasive if JS had admitted the prospect of a lawsuit or acknowledged his intentions in retaining private counsel. But JS denied that he had discussed even the possibility of a lawsuit. And the State argued both in summation and rebuttal that Defendant had "no evidence" that JS was motivated by an intent to sue for civil damages.

■ Error is harmless "if we can say, beyond a reasonable doubt, that [it] did not contribute to or affect the verdict." *State v. Bible*, 175 Ariz. 549, 588, 858 P.2d 1152, 1191 (1993). This was not a case in which Defendant was faced with overwhelming evidence of guilt. Lack of physical evidence made JS the crucial witness, and the "accuracy and truthfulness of [his] testimony were [the] key elements in the State's case." *Davis*, 415 U.S. at 317, 94 S.Ct. at 1111. The lawyers debated in final argument whether the testimony of JS was tainted by an ulterior motive, but the debate was skewed by the absence of evidence that JS had indeed filed a civil lawsuit which a process server was waiting to serve. We cannot say beyond a reasonable doubt that exclusion of the evidence did not affect or contribute to the verdict. *See, e.g., State v. Melendez*, 121 Ariz. 1, 3–4, 588 P.2d 294, 296–97 (1978); *State v. Figueroa*, 98 Ariz. 146, 150, 402 P.2d 567, 569–70 (1965).

Though we find reversible error on this ground, we also address the unlawful use of Defendant's immunized testimony, as the issue will recur on remand and our resolution requires an evidentiary hearing before any retrial.

## III.

■ In collateral administrative proceedings arising from JS's allegations, the Arizona Board of Medical Examiners ("BOMEX") conducted hearings and suspended Defendant's license to practice medicine. In the course of those proceedings, BOMEX issued an order ("the Order") compelling De-

fendant to testify pursuant to Arizona Revised Statutes Annotated ("A.R.S.") § 41–1066. Section 41–1066(C) states:

Evidence produced pursuant to subsection B is not admissible in evidence or usable in any manner in a criminal prosecution, except for perjury, false swearing, tampering with physical evidence or any other offense committed in connection with the appearance made pursuant to this section against the person testifying or the person producing his private papers.

The Order expressly prohibited use of Defendant's testimony in subsequent proceedings, subject only to the exceptions of § 41–1066(C).

In July 1992, Nancy Beck, the Assistant Attorney General who represented BOMEX in license-suspension proceedings against Defendant, gave transcripts of Defendant's compelled testimony to Vince Imbordino, the Maricopa County prosecutor who tried this case. She did not, however, provide a copy of the Order until the prosecution had concluded, and Imbordino would later testify that he did not know the BOMEX testimony was immunized when he reviewed the transcripts to prepare his case.

Beck also participated in the criminal prosecution of Defendant. Though she did not take a courtroom speaking role, she consulted with Imbordino before and during trial, sat at the prosecution table nearly every day of trial, and accompanied Imbordino to arguments in chambers on motions and evidentiary matters. Minute entries during trial list both the County Attorney by Imbordino and the Attorney General by Beck as appearing for the State.

At trial, Defendant successfully moved to preclude the State's use of BOMEX transcripts for impeachment purposes, but Imbordino had already read and used the BOMEX transcript to prepare his cross-examination. After the verdicts, Defendant moved for a new trial on the ground that the State's use of the transcripts violated

the immunity statute and his fifth amendment rights. After a hearing, the trial court denied the motion, finding that the State did not use the compelled testimony in prosecuting Defendant and that Defendant had waived the issue by failing to raise it in a timely manner.

Defendant appeals from the trial court's denial of his motion for new trial.

### A.

■ To pass constitutional muster, a state use-immunity statute such as § 41–1066(C) must provide immunity no less extensive than the fifth amendment privilege against self-incrimination. *Kastigar v. United States,* 406 U.S. 441, 453, 92 S.Ct. 1653, 1660, 32 L.Ed.2d 212 (1972); *John Doe I v. Superior Court,* 149 Ariz. 169, 171, 717 P.2d 473, 475 (App.1985). Lesser protection does not suffice to compel testimony over a claim of fifth amendment privilege. *Kastigar,* 406 U.S. at 453, 92 S.Ct. at 1660.

Though no cases have construed the scope of immunity afforded by A.R.S. § 41–1066, there is abundant authority construing the federal use-immunity statute, 18 U.S.C. § 6002.[3] *Kastigar,* the seminal case, holds that § 6002 "prohibits the prosecutorial authorities from using the compelled testimony in *any* respect, and it therefore insures that the testimony cannot lead to the infliction of criminal penalties on the witness." 406 U.S. at 453, 92 S.Ct. at 1660 (emphasis in original). *Kastigar* adds, "This total prohibition on use provides a comprehensive safeguard, barring the use of compelled testimony as an 'investigatory lead.'" *Id.* at 460, 92 S.Ct. at 1664. To be effective, an immunity statute must leave "the witness and the prosecutorial authorities in substantially the same position as if the witness had claimed the Fifth Amendment privilege." *Id.* at 462, 92 S.Ct. at 1665.

Despite *Kastigar*'s broad proscriptive language, lower federal courts have divided over

---

3. 18 U.S.C. § 6002 provides in pertinent part:
   [N]o testimony or other information compelled under the [use immunity] order (or any information directly or indirectly derived from such testimony or other information) may be used

against the witness in any criminal case, except a prosecution for perjury, giving a false statement, or otherwise failing to comply with the order.

**44**

the propriety of non-evidentiary use of immunized testimony in subsequent prosecutions of an immunized witness. *See* compilation of cases set forth in *United States v. North*, 910 F.2d 843, 857–60 (D.C.Cir.1990). We need not linger over the conflict in the federal case law, however, because A.R.S. § 41–1066, far more explicitly than 18 U.S.C. § 6002, prohibits use of immunized testimony "in any manner," with limited exceptions not applicable here.[4] The statutory proscription is clear; it makes no exception for investigation, trial preparation, or other derivative, non-evidentiary uses, and we interpret the statute as written.

To prosecute a defendant who has been compelled to testify under use immunity, the State faces a heavy burden to place itself "in substantially the same position as if the witness had claimed the Fifth Amendment privilege." *Kastigar*, 406 U.S. at 462, 92 S.Ct. at 1665; *North*, 910 F.2d at 858. The case law demonstrates, however, that this burden neither constitutes an insurmountable barrier to prosecution nor requires automatic disqualification of any prosecutor exposed to a defendant's immunized prior testimony. In *United States v. Pantone*, for example, the court found that the government had met its "high proof burden" by proving that the prosecutor who elicited the immunized testimony at a grand jury hearing concerning another suspect had completed his trial preparation and gathered his evidence to prosecute the defen-

dant before taking the immunized testimony and had not used the immunized testimony for any purpose—evidentiary, preparatory, or strategic—in the prosecution of the defendant. 634 F.2d 716, 719–22 (3d Cir.1980). Division Two of this court followed a similar approach in *State v. Maximo*, 170 Ariz. 94, 96–97, 821 P.2d 1379, 1381–82 (App.1991).[5]

In this case, the prosecution did not meet its heavy burden. It made no effort to establish "reliable procedures for segregating the immunized testimony and its fruits from officials pursuing any subsequent investigations." *United States v. Hampton*, 775 F.2d 1479, 1490 (11th Cir.1985). Instead, the administrative prosecutor compelled Defendant to testify subject to immunity, then ignored the order of immunity, turned Defendant's testimony over to the criminal prosecutor, participated in the criminal prosecution, and neglected or declined to inform the criminal prosecutor that an immunity order had been entered. The criminal prosecutor, uninformed of the immunized status of Defendant's BOMEX testimony, read it, took notes about it, used it to prepare for cross-examination and impeachment, and made no effort to sort the information in the immunized portion of the transcripts from other information that he reviewed in preparing for trial. On this record, the trial court's ruling that the State did not use the testimony was contrary both to the evidence and the law. We proceed to the question of waiver.

---

**4.** The unusable-in-any-manner language of A.R.S. § 41–1066 likewise distinguishes that statute from A.R.S. § 13–4064, which permits the taking of compulsory testimony, subject to a grant of use immunity, "[i]n any criminal proceeding before a court or grand jury." The proscriptive portion of § 13–4064 states:

After complying, such testimony or evidence, or any information directly or indirectly derived from such testimony or evidence, shall not be used against the person in any proceeding or prosecution for a crime or offense concerning which he gave answer or produced evidence under court order. However, he may nevertheless be prosecuted or subjected to penalty or forfeiture for any perjury, false swearing or contempt committed in answering, or failing to answer, or in producing, or failing to produce, evidence in accordance with the order.

**5.** Although "courts have generally declined to erect a per se rule requiring withdrawal of a prosecutor or other government official who may

have been exposed to immunized testimony," "a prosecutor's failure to withdraw certainly makes it more difficult for the government to prove that the compelled testimony did not contribute to the prosecution." *United States v. Harris*, 973 F.2d 333, 337 (4th Cir.1992). For this reason, it is now standard federal procedure "to insulate a prosecutor and/or investigator who is familiar with the immunized statement from subsequent prosecution of the compelled witness or to seal the incriminating documents." *Id.* The United States Department of Justice recommends that "prosecution of a compelled witness be handled by an attorney unfamiliar with the substance of the compelled testimony." *Id., citing* United States Attorneys' Manual, § 1–11.400; *see also United States v. Crowson*, 828 F.2d 1427, 1429 (9th Cir.1987), *cert. denied*, 488 U.S. 831, 109 S.Ct. 87, 102 L.Ed.2d 63 (1988); *United States v. Hampton*, 775 F.2d 1479, 1490 (11th Cir.1985).

### B.

■ A witness can intentionally relinquish the protection that a use-immunity statute affords. *See United States v. Dortch*, 5 F.3d 1056, 1068–69 (7th Cir.1993) (a clear and specific written waiver signed by the defendant and his attorney was sufficient to waive use of immunized testimony). Only when objection is required by rule or statute, however, or when the use of immunized testimony is clear does waiver result from failure to object. *United States v. Moss*, 562 F.2d 155, 164 (2d Cir.1977), *cert. denied*, 435 U.S. 914, 98 S.Ct. 1467, 55 L.Ed.2d 505 (1978).

According to the post-trial hearing in this case, Mr. Imbordino told defense counsel before trial that he intended to use Defendant's BOMEX testimony for cross-examination and impeachment, and defense counsel responded that he would object. Neither lawyer brought the issue to the trial court, however, until Defendant's cross-examination was imminent, when defense counsel successfully objected to any usage of the testimony in cross-examination. Not until after trial did defense counsel raise the larger issue that the prosecution had violated the proscription against use "in any manner," and not until after trial, upon deposing Beck and reviewing Imbordino's notes, did the defense discover the extent of the State's use.

■ The trial court found waiver in these circumstances because "defendant knew the issue of [the county prosecutor] having read [Defendant's] compelled testimony existed ... but did nothing to correct this error before the trial started." Yet the State likewise did nothing before trial started to correct its violation of the immunity statute or to seek trial-court approval before attempting to put immunized testimony to prosecutorial use. The burden is upon the government to respect immunity, not upon the witness to enforce it. *See Moss*, 562 F.2d at 164.

"The constitutional validity of use immunity as distinguished from transactional immunity depends upon a fair adherence to the integrity of the process." *Id.* In this case, the State did not fairly adhere to the integrity of the process. Rather, when the adminis-trative prosecutor transmitted immunized testimony to the criminal prosecutor, who used it, the State egregiously abused the integrity of the process. Under these circumstances, we find that the trial court erred in ruling that Defendant waived his right to object and in denying Defendant's motion for new trial.

### IV.

■ For the foregoing reasons, we reverse Defendant's convictions and remand for a new trial. Before commencing retrial, the trial court shall require the State, at a *Kastigar* hearing, to prove by a preponderance of the evidence that it has "followed reliable procedures for segregating the immunized testimony and its fruits from officials pursuing any subsequent" prosecution, *Hampton*, 775 F.2d at 1490; that it has a source for all of its evidence wholly independent of the immunized testimony; and that it has not put the testimony to any non-evidentiary, derivative use.

WEISBERG and GARBARINO, JJ., concur.